**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| NANCY NICOLAOU AND NICHOLAS NICOLAOU, | : No. 44 MAP 2017 |
| | : |
| | : Appeal from the Order of the Superior |
| Appellants | : Court at No. 1286 EDA 2014 dated |
| | : December 22, 2016 Affirming the |
| | : Order of the Court of Common Pleas |
| v. | : Lehigh County, Civil Division, at No. |
| | : 2012-C-0518 dated February 24, 2014. |
| | : |
| JAMES J. MARTIN, M.D., LOUISE A. | : |
| DILLONSYNDER, CRNP, JEFFREY D. | : |
| GOULD, M.D., ST. LUKE'S HOSPITAL, ST. | : |
| LUKE'S HOSPITAL AND HEALTH | : |
| NETWORK, ST. LUKE'S HOSPITAL | : |
| UNION STATION MEDICAL SURGICAL | : |
| CLINIC D/B/A ST. LUKE'S SOUTHSIDE | : |
| MEDICAL CENTER, ST. LUKE'S | : |
| ORTHOPAEDIC SURGICAL GROUP, AND | : |
| NAZARETH FAMILY PRACTICE, | : |
| | : |
| Appellees | : ARGUED: May 17, 2018 |

**OPINION**

**JUSTICE BAER**                                    **DECIDED: October 17, 2018**

This appeal presents the issue of whether Appellants Nancy and Nicholas Nicolaou (collectively referred to as "Plaintiffs") satisfied the discovery rule so as to toll the running of the statute of limitations on their medical malpractice action filed against Appellee health care providers (collectively referred to as "Defendants") for failing to diagnose and treat Mrs. Nicolaou's Lyme disease. The trial court granted summary judgment in favor of Defendants, deeming Plaintiffs' action time-barred. The Superior

Court affirmed, holding that the discovery rule did not toll the statute of limitations because, as a matter of law, Plaintiffs failed to establish that they pursued their action with reasonable diligence. For the reasons set forth herein, we hold that summary judgment was granted improperly because the determination of whether Plaintiffs acted with due diligence under the circumstances presented is one of fact for a jury to decide. Accordingly, we vacate the judgment of the Superior Court, reverse the order granting summary judgment, and remand to the trial court for further proceedings consistent with this opinion.

## I. Background

The record establishes that sometime in 2001, Nancy Nicolaou was bitten by a tick on her left ankle, after which she developed a rash and experienced numbness and tingling in her left toe, fatigue, and lower back pain. Second Amended Civil Action Complaint (Medical Malpractice) (hereinafter "Second Amended Complaint"), at ¶13. As explained in detail *infra*, from 2001 through 2008, each of the following Defendants provided Mrs. Nicolaou with medical care: James J. Martin, M.D.; Jeffrey D. Gould, M.D.; St. Luke's Hospital and Health Network; St. Luke's Hospital Union Station Medical Surgical Clinic, d/b/a/ St. Luke's Southside Medical Center; St. Luke's Orthopaedic Surgical Group; and Nazareth Family Practice.

Initially, in August of 2001, Mrs. Nicolaou reported her recent tick bite and resulting symptoms, including a rash that was still visible, to Dr. Stephen P. Falatyn, an alleged agent of Appellee St. Luke's Hospital and St. Luke's Hospital Health Network.[1] *Id.* at 13. Dr. Falatyn did not begin antibiotic therapy treatment based on Mrs.

---

[1] Dr. Falatyn is not involved in this appeal as he was dismissed pursuant to a stipulation of the parties entered on June 5, 2012.

Nicolaou's clinical symptoms, the standard treatment for Lyme disease, but ordered a Lyme disease test, the results of which were negative. *Id.*

When her symptoms continued, Mrs. Nicolaou sought medical care from Appellee Dr. James J. Martin, an alleged employee of Appellee Nazareth Family Practice. *Id.* at ¶¶ 4, 14. Dr. Martin treated Mrs. Nicolaou from June of 2002, until May of 2005. *Id.* at ¶ 14. Mrs. Nicolaou informed Dr. Martin of her ailments that arose after she was bitten by a tick, which had expanded to include tingling and numbness in her left leg, decreasing sensation in the left foot, fatigue, lower back pain, incontinence, and difficulty walking. *Id.* at 14. Dr. Martin did not treat Mrs. Nicolaou with antibiotics or refer her to a Lyme disease specialist. Rather, on May 10, 2005, Dr. Martin ordered a second Lyme disease test, an IGM Western Blot test, which indicated an equivocal negative result. *Id.* The test cautioned that "[t]he screening for B. Burgdorferi [the bacterium that causes Lyme disease] has a low predictive value for a negative result when used to detect early infection." *Id.*

Certified Nurse Practitioner Louise A. Dillonsynder took charge of Mrs. Nicolaou's medical care from late May of 2005, through December of 2006.[2] *Id.* at ¶ 15. Once again, Mrs. Nicolaou reported her continuing symptoms of chronic leg pain and weakness, urinary incontinence, and joint stiffness and numbness of her left leg and fingers. *Id.* at ¶ 15. On July 3, 2006, Nurse Dillonsynder ordered an MRI of Mrs. Nicolaou's brain. The MRI indicated findings "seen in infectious or inflammatory demyelinating process, such as multiple sclerosis ["MS"] or Lyme Disease . . . ." *Id.* at ¶¶ 15, 27.5. Nurse Dillonsynder subsequently ordered a Lyme disease test, Mrs.

---

[2] Nurse Dillonsynder was an alleged agent of Appellees St. Luke's Hospital and Health Network and St. Luke's Southside Medical Center. *Id.* at 5. She was voluntarily dismissed from this medical malpractice action on March 28, 2014, as she was never served with original process.

Nicolaou's third, the results of which were again negative, although the lab report acknowledged the limitations of the test conducted.[3] *Id.* Insisting that Mrs. Nicolaou was suffering from MS, Nurse Dillonsynder did not prescribe antibiotics for Lyme disease. *Id.*

Mrs. Nicolaou's maladies endured, and in early 2007, she sought treatment from Appellee Dr. Jeffrey D. Gould, who provided her medical care through 2008. *Id.* at ¶ 16. As with her previous health care providers, Mrs. Nicolaou informed Dr. Gould of her 2001 tick bite and the resulting symptoms, which had expanded into increased inability to walk, fatigue, incontinence, and new lesions about the brain and spine, as well as her belief that her symptoms may have been caused by Lyme disease. *Id.* Dr. Gould ordered a fourth Lyme disease test on April 11, 2007, and the results were again negative. *Id.* Similar to the previous negative test results, however, the laboratory report cautioned that the test did not exclude B. Burgdorferi infection, the bacterium that causes Lyme disease. *Id.* Although Dr. Gould was privy to the 2006 MRI indicating that Mrs. Nicolaou suffered from either MS or Lyme disease, he definitively told Mrs. Nicolaou that she did not have Lyme disease and that she was suffering from MS. *Id.; see also* Deposition of Dr. Gould, Nov. 6, 2013 (hereinafter "Gould Deposition"), at 68 (acknowledging that Dr. Gould believed that he convinced Mrs. Nicolaou that she did

---

[3] Specifically, the laboratory report stated:

> No Detectible 1gG/Lgm antibody, result does not exclude B. Burgdorferi infection. The specimen may have been drawn prior to the appearance of detectable antibodies or antibodies present may be below the detection limits of the assay. Early antibiotic therapy may suppress antibody response and some individuals may not develop antibodies above detectible levels.

*Id.*

not have Lyme disease).[4]  Accordingly, Dr. Gould declined to administer antibiotics for Lyme disease and, instead, began an aggressive regimen of steroids for MS, after which Mrs. Nicolaou's symptoms worsened dramatically, ultimately rendering her confined to a wheelchair.  Second Amended Complaint, at ¶ 16.

At some point in 2007, Mrs. Nicolaou suspected that she may have Lyme disease and not MS due to the onset of her symptoms after the tick bite, her 2006 MRI indicating that she had either Lyme disease or MS, and the unsuccessful nature of the MS treatment.  *Id.* at ¶¶ 16-17.  Accordingly, she stopped seeking medical treatment from Defendants, and sought another professional medical opinion.  *Id.* at ¶ 17.  After learning that Nurse Practitioner Rita Rhoads had helped individuals with Lyme disease who had been misdiagnosed with MS, Mrs. Nicolaou began treatment with Nurse Rhoads on July 20, 2009, and continued such treatment on four subsequent occasions: September 21, 2009, November 9, 2009, December 7, 2009, and February 1, 2010. Deposition of Nancy Nicolaou, Nov. 6, 2013 (hereinafter "Nicolaou Deposition"), at 65-71;[5] Deposition of Rita Rhoads, Nov. 1, 2013 (hereinafter "Rhoads Deposition") at 10, 32, 41, 53.

---

[4] In a deposition given after Mrs. Nicolaou ultimately tested positive for Lyme disease, Dr. Gould continued to believe that she did not have the condition.  *See* Gould Deposition, at 68 (recognizing that many of Mrs. Nicolaou's symptoms were alleviated after Lyme disease antibiotic treatment was administered, but continuing to opine that she did not suffer from Lyme disease as "MS can flare up and get better").

[5] The certified record does not contain the entirety of Mrs. Nicolaou's November 6, 2013 deposition.  Nevertheless, because the reproduced record contains the missing pages and there is no dispute as to accuracy of the reproduction, we consider all of Mrs. Nicolaou's deposition.  *See Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012) (considering a written plea colloquy that was not contained in the original record and only appeared within the reproduced record because the accuracy of the reproduction was not disputed).

During the first visit on July 20, 2009, after having reviewed Mrs. Nicolaou's medical history, personal account of the events, and the 2006 MRI of her brain, Nurse Rhoads informed Mrs. Nicolaou that she believed Mrs. Nicolaou had probable Lyme disease stemming from her 2001 tick bite. Rhoads Deposition, at 25; Nicolaou Deposition, at 61. In Nurse Rhoads' opinion, Mrs. Nicolaou's previous Lyme disease tests may have indicated false negatives because such tests were developed to account for a Lyme disease vaccine, which had been taken off of the market prior to the events at issue. Rhoads Deposition, at 27-28. Even absent a positive Lyme disease test, Nurse Rhoads prescribed a course of antibiotics as a way of determining whether Mrs. Nicolaou's symptoms would respond to such treatment. *Id.* at 23.

In the course of the next couple of visits, Nurse Rhoads suggested to Mrs. Nicolaou that to confirm a diagnosis of Lyme disease, she should undergo a test offered by a company called IGeneX, Inc., which cost approximately $250.[6] Nicolaou Deposition, at 62. Mrs. Nicolaou asserted that she declined the IGeneX test because she wanted to wait and see how her symptoms were going to react to the antibiotics. *Id.*, at 75. Nurse Rhoads indicated that Mrs. Nicolaou declined the IGeneX test because she could not afford it. Rhoads Deposition, at 29, 53. At this point in time, Mrs. Nicolaou had no health insurance as she had voluntarily stopped paying her premiums in 2005, after her health insurance coverage failed to pay for her requisite medical expenses. *Id.* at 23; Nicolaou Deposition, at 35; *see also* Rhoads Deposition, at 35 (asserting that Mrs. Nicolaou informed Nurse Rhoads that she had no health

---

[6] Nurse Rhoads recalled suggesting that Mrs. Nicolaou take the IGeneX test during the July 20, 2009 visit. Rhoads Deposition, at 53. Mrs. Nicolaou, however, maintained that Nurse Rhoads did not recommend the IGeneX test during that first visit, but did so "a couple visits into seeing her." Nicolaou Deposition, at 62.

insurance, that she was not eligible for federal benefits, and that her husband was laid off).

After two months of taking the prescribed antibiotics, some of Mrs. Nicolaou's symptoms improved, including the resumption of bladder and bowel control, although she remained wheelchair bound. Rhoads Deposition, at 35; Second Amended Complaint at ¶18. Mrs. Nicolaou ultimately agreed to take the IGeneX Lyme disease test during the February 1, 2010 visit with Nurse Rhoads. Nicolaou Deposition, at 74. Nurse Rhoads administered the test that day and sent Mrs. Nicolaou's specimen to the IGeneX laboratory in Palo Alto, California. *Id.*

Nurse Rhoads informed Mrs. Nicolaou on February 13, 2010, via email, that the test results were positive for Lyme disease. Second Amended Complaint, at ¶ 18. That day, Mrs. Nicolaou posted a message on her Facebook page stating that her IGeneX test results came back positive for Lyme disease, that she had been telling everyone for years that she thought it was Lyme disease, and that her doctors had ignored her. Appellees' Trial Exhibit F; Nicolaou Deposition, at 76-78.

Within two years of receiving the positive Lyme disease test, on February 10, 2012, Plaintiffs initiated this lawsuit against Defendants by way of a complaint. Amended complaints were filed on April 19, 2012, and May 31, 2012. In the second amended complaint, Mrs. Nicolaou asserted, *inter alia*, that Defendants were negligent for failing to diagnose and treat her Lyme disease with antibiotics and that due to such negligence, her Lyme disease infection became chronic and permanent, confining her to a wheelchair. Mr. Nicolaou asserted claims against Defendants for loss of consortium.

In their Answer with New Matter, Defendants raised, *inter alia*, the affirmative defense of the statute of limitations. In their Second Amended Complaint, Plaintiffs

asserted that although they commenced their action more than three years after Mrs. Nicolaou's last contact with Defendants, their lawsuit was not time-barred because a reasonable person in Mrs. Nicolaou's position could not have discovered any medical negligence until February 13, 2010, the date Mrs. Nicolaou was given the positive Lyme disease test result. Second Amended Complaint at ¶¶ 19-20. Because their complaint was filed within two years thereafter, on February 10, 2012, Plaintiffs posited that their action was timely filed.[7] *Id.*

On December 6, 2013, following the completion of discovery, Defendants filed a motion for summary judgment. Therein, they contended that between July 20, 2009 and February 1, 2010 (Mrs. Nicolaou's first and last visits with Nurse Rhoads), Plaintiffs reasonably should have known that Mrs. Nicolaou's long-standing health problems may have been caused by Defendants' failure to diagnose and treat her properly for Lyme disease, yet Plaintiffs did not file their action until more than two years later on February 10, 2012. Defendants' Motion for Summary Judgment at ¶ ¶ 37, 49, 54, 58. Defendants asserted that during this period, Nurse Rhoads informed Mrs. Nicolaou that she believed that her symptoms were caused by Lyme disease, prescribed antibiotics to treat Lyme disease, and suggested that that such diagnosis should be confirmed through a test offered by IGeneX. *Id.* at 50. Defendants maintained that Mrs. Nicolaou acted unreasonably when she refused to submit to the IGeneX test to confirm the Lyme disease diagnosis until February 1, 2010, despite Nurse Rhoads recommendation that she take the test earlier. *Id.* at ¶ 52. Accordingly, Defendants concluded that the discovery rule did not act to toll the running of the statute of limitations on Plaintiffs'

---

[7] The statute of limitations to file an action to recover damages for injuries to the person caused by the wrongful act, neglect, or negligence of another is two years. 42 Pa.C.S. § 5524(2).

claims. Similarly, Defendants argued that Mr. Nicolaou's claim for loss of consortium was likewise barred by the statute of limitations. *Id.* at ¶ 55.

In their answer to Defendants' motion for summary judgment, Plaintiffs contended that the statute of limitations did not begin to run until February 13, 2010, the date Mrs. Nicolaou was informed of her positive Lyme disease test and that the action was filed within two years thereafter. Plaintiffs' Answer to Defendants' Motion for Summary Judgment, at 58. They maintained that if there was any question of fact in this regard, a jury, and not the trial court, should resolve it. *Id.* at 48. Plaintiffs further asserted that Mrs. Nicolaou did not act unreasonably in failing to obtain the IGeneX test sooner as she did not have the money to pay for the test. *Id.* at 52, 53.

The trial court granted summary judgment in favor of Defendants. Recognizing that the determination of when a plaintiff should reasonably be aware of her injury is generally an issue of fact to be determined by the jury, the trial court held that the present facts were so clear that reasonable minds could not differ that the statute of limitations began to run more than two years before February 12, 2012, when the action was filed. Trial Court Opinion, Feb. 24, 2014, at 8-9.

The trial court reasoned that prior to Mrs. Nicolaou's last visit with Nurse Rhoads on February 1, 2010, Mrs. Nicolaou was aware that her symptoms arose after a tick bite; that a 2006 MRI indicated that she had either MS or Lyme disease; that treatment for MS had been unsuccessful; that Nurse Rhoads believed she probably had Lyme disease based on her clinical symptoms and prior MRI; that Nurse Rhoads treated her for Lyme disease by administering antibiotics, after which Mrs. Nicolaou saw an improvement in her symptoms; and that Nurse Rhoads had urged Mrs. Nicolaou to confirm the diagnosis with a different type of Lyme disease test.

The trial court reasoned that not only would a reasonable person have suspected that Mrs. Nicolaou's injuries could have been caused by Defendants' failure to diagnose and treat her Lyme disease, but that Mrs. Nicolaou actually suspected such connection, as demonstrated by her Facebook post, stating that she suspected she had Lyme disease before she received the positive test results. Finally, the trial court rejected the contention that Mrs. Nicolaou's inability to pay for a fifth Lyme disease test tolled the statute of limitations, finding that Mrs. Nicolaou "could have confirmed her suspicion regarding the Lyme disease diagnosis on or about the December 7, 2009 visit, but she opted not to." *Id.* at 14.

Plaintiffs, acting *pro se*, appealed the trial court's grant of summary judgment to the Superior Court. Initially, a panel of that court reversed in an unpublished memorandum, holding that when viewing the facts in the light most favorable to Plaintiffs, the question of when they should have been reasonably aware that Mrs. Nicolaou suffered a misdiagnosis was an issue of fact for the jury. Then-Judge, now-Justice Wecht dissented, finding that Plaintiffs waived the issue by filing a defective *pro se* brief.

The Superior Court granted Defendants' motion for reargument *en banc,* and directed Plaintiffs, who were then represented by counsel, to file a proper appellate brief addressing the relevant issues on appeal. Plaintiffs complied with this directive. The *en banc* Superior Court subsequently vacated the prior panel decision and affirmed the order of the trial court in an opinion by Judge Shogun. *Nicolaou v. Martin*, 153 A.3d 383 (Pa. Super. 2016) (*en banc*). The majority determined that reasonable minds could not differ that, as early as July of 2009 and through September of 2009, Mrs. Nicolaou knew or should have known that she suffered from Lyme disease and that her array of health

problems could have been caused by Defendants' failure to diagnose and treat that condition. *Id.* at 394.

The court found that by such time, an MRI had indicated that Mrs. Nicolaou suffered from either MS or Lyme disease; Nurse Rhoads had informed Mrs. Nicolaou that she believed she may have Lyme disease and prescribed antibiotics; Mrs. Nicolaou's symptoms improved upon treatment for Lyme disease; and, most significantly, Mrs. Nicolaou had declined to take the IGeneX test for several months to confirm Nurse Rhoad's diagnosis. *Id.* at 394-95. The majority viewed Mrs. Nicolaou's failure to undergo the suggested IGeneX test when recommended as a voluntary refusal, untethered to any inability to pay for the test. *Id.* at 395, n. 8 (stating "there is nothing in the record confirming that Mrs. Nicolaous [sic] was **unable** to pay for the IGeneX test when [Nurse Rhoads] ordered it on July 20, 2009, only that Mrs. Nicolaous [sic] chose not to do so") (emphasis in original).

In so holding, the Superior Court relied upon *Gleason v. Borough of Moosic*, 15 A.3d 479, 484-85 (Pa. 2011), where this Court observed that a greater burden is placed upon Pennsylvania plaintiffs asserting the discovery rule because invocation of this doctrine "is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause.'" *Nicolaou*, 153 A.3d at 395. Applying this jurisprudence to the facts presented, the Superior Court concluded that "Mrs. Nicolaou knew, or reasonably should have known, between July and September, 2009, that her long-standing health problems may have been caused by [Defendants'] failure to diagnose and treat her [L]yme disease and therefore, such failure could have resulted from [Defendants'] negligence." *Id.* Finding no genuine

issues of material fact, the court held that the trial court's entry of summary judgment in favor of Defendants was proper. *Id.*

Judge Lazarus filed a dissenting opinion, joined by President Judge Gantman and Judge Bowes. According to the dissent, the majority improperly assumed the role of factfinder when it concluded that, as a matter of law, Plaintiffs were not reasonably diligent in determining the cause of Mrs. Nicolaou's injury. The dissent readily acknowledged that Mrs. Nicolaou suspected that she may have Lyme disease in July of 2009, when she began treatment with Nurse Rhoads. Judge Lazarus opined, however, that "hardship regarding paying for a fifth test when first suggested, along with four previous negative tests and Mrs. Nicolaou's stated intention to determine whether the antibiotics Nurse Rhoads had prescribed would work, combine to create a jury question as to whether the Nicolaous were reasonably diligent in determining the suspected injury *actually* had been suffered." *Id.* at 396 (emphasis in original).

The dissent observed that while "reasonable diligence is an objective test, [i]t is sufficiently flexible . . . to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Id.* (citing *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) (internal citation and quotation marks omitted)). Viewing the facts in the light most favorable to Plaintiffs, as the nonmoving party, the dissent would have reversed and remanded the matter to the trial court to permit the jury to determine whether the statute of limitations should have remained tolled until February 13, 2010, when Mrs. Nicolaou received the positive Lyme disease test, thereby rendering Plaintiffs' complaint timely filed on February 12, 2012.

This Court granted allocatur to address two issues: (1) whether summary judgment was improperly granted in favor of Defendants on the ground that Plaintiffs

failed to satisfy the discovery rule when they lacked the funds to obtain further medical testing to confirm that Defendants' negligent misdiagnosis was linked to Mrs. Nicolaou's medical ailments; and, (2) whether summary judgment was improperly granted in favor of Defendants when there was a genuine issue of material fact that should have been presented to a jury regarding whether Plaintiffs' action was tolled by the discovery rule.[8]

## II. Parties' Arguments

Reiterating the essence of the claims raised below, Plaintiffs, as appellants, contend that the lower courts erred by concluding, as a matter of law, that they failed to exercise reasonable diligence. They assert that Defendants had the burden to prove that no juror could find a lack of reasonable diligence, and that they failed to satisfy this burden. Specifically, Plaintiffs challenge the Superior Court's conclusion that a reasonable person should have known between July and September of 2009 that Mrs. Nicolaou's chronic medical condition may have been caused by Defendants' negligence in failing to diagnose and treat her Lyme disease.

Central to Plaintiffs' position is their contention that the determination of whether a person is able to ascertain an injury is a subjective one, dependent upon what an individual in the plaintiff's particular circumstances would do, *i.e.*, a reasonable person uneducated in complex medical issues who had four Lyme disease tests with negative results; who had been repeatedly and definitively diagnosed with MS and had been convinced by the treating physician that any suspicions of Lyme disease were unfounded; and who had been unable to pay the costs related to a suggested fifth Lyme disease test.

---

[8] As neither of the parties separate their arguments to correspond directly with the two issues for which allocatur was granted, the issues are discussed together in this opinion.

Emphasizing the final factor of an inability to pay for further diagnostic testing, Plaintiffs argue that one's financial ability to obtain medical treatment is a consideration in determining whether he or she acted with the requisite diligence in determining the cause of injury. *See* Brief for Appellant at 18 (asserting that if left undisturbed, the Superior Court's decision "will stand for the unequitable proposition that those in our Commonwealth without the financial means to seek medical testing are not treated equally under the law"). Accordingly, Plaintiffs request that we "provide a clear rule stating that a person's economic status cannot be held against them in their efforts to discover the truth." *Id.* In Plaintiffs' view, the Superior Court ignored the factual circumstances specified above relevant to a diligence inquiry, and, instead, made false assumptions regarding Mrs. Nicolaou's intent and knowledge.[9]

When viewing the facts in the light most favorable to them as the non-moving party, Plaintiffs conclude that genuine issues of material fact exist regarding application of the discovery rule, which should have been resolved by a jury. They suggest that it is reasonable to conclude that, considering the circumstances that Mrs. Nicolaou faced, the statute of limitations did not begin to run until February 13, 2010, when she was notified of the positive IGeneX Lyme disease test results. Until that time, Plaintiffs submit, they neither knew nor should have known that Mrs. Nicolaou's medical infirmities were linked to Defendants' negligence in failing to diagnose and treat her Lyme disease, rather than having been caused by the onset of MS, as diagnosed by her

---

[9] As further evidence that reasonable minds could differ regarding whether they acted with diligence in pursuing their claim, Plaintiffs rely on the intermediate appellate court's split decision on the issue. Brief of Appellants at 20 (citing *Cochran v. GAF Corp.*, 666 A.2d 245, 253 (Pa. 1995) (Cappy, J., dissenting) (suggesting that if a full complement of the Superior Court cannot agree as to what reasonable minds would find regarding application of the discovery rule, it is self-evident that the matter necessitates submission to a jury)).

treating physicians for years. Additionally, Plaintiffs assert that prior to receiving these test results, they could not have obtained the requisite certificate of merit ("COM") pursuant to Pa.R.C.P. 1042.3. [10]

In response, Defendants contend that the Superior Court was correct in determining, as a matter of law, that Plaintiffs failed to satisfy the discovery rule, which tolls the running of the statute of limitations until the point where the complaining party knows or reasonably should know that he or she has been injured and that the injury has been caused by another party's conduct. Defendants maintain that, contrary to Plaintiffs' assertions, the party relying upon the discovery rule bears the burden of proving application of the doctrine, and the determination of whether one is able to

---

[10] Pennsylvania Rule of Civil Procedure 1042.3 provides, in relevant part:

> In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either
>
>> (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or
>>
>> (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or
>>
>> (3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

Pa.R.C.P. 1042.3(a).

ascertain an injury is objective, tolling the statute only if a reasonable person in the plaintiff's position would have been unaware of salient facts. Defendants characterize Plaintiffs' position as an attempt to rewrite the reasonable diligence standard to account only for what the plaintiff actually knew, rather than what the plaintiff reasonably should have known through the exercise of due diligence.

In furtherance of these arguments, Defendants contend that sometime between July 20, 2009, and February 1, 2010, Nurse Rhoads informed Mrs. Nicolaou of a probable diagnosis of Lyme disease, treated her for Lyme disease with antibiotics that improved substantially some of her symptoms, and recommended that Mrs. Nicolaou confirm her diagnosis by taking the IGeneX Lyme disease test. Accordingly, they submit, the record is clear that Plaintiffs either knew or should have known that Mrs. Nicolaou's alleged injuries could have been caused by Defendants' negligence at the latest on February 1, 2010, and Plaintiffs did not file their action until more than two years later on February 13, 2012.

Defendants agree with the lower courts that Mrs. Nicolaou's delay in taking the IGeneX test to confirm Nurse Rhoads' probable diagnosis of Lyme disease demonstrates her lack of diligence in ascertaining the cause of her injury and, thus, is fatal to her discovery rule claim. They discount Plaintiffs' purported inability to pay for further medical testing, finding such assertion to be both unsupported by the record and unwarranted under the law as the standard for reasonable diligence is an objective one as applied to a "reasonable" person. Defendants emphasize that when given the opportunity during her deposition to explain why she delayed taking the IGeneX test, Mrs. Nicolaou testified that she "wanted to see how the antibiotics were going to react to [her] symptoms," Nicolaou Deposition, at 75, and not that she lacked the financial

means to pay for the test.[11]  Thus, Defendants argue that no reasonable person in Mrs. Nicolaou's position would have failed to obtain the IGeneX test.

Defendants further refute Plaintiffs' contention that they could not obtain a COM until they received a definitive diagnosis of Lyme disease and, thus, the statute of limitations should have tolled until that time.  Defendants point out that under the plain language of the Rules of Civil Procedure, a plaintiff can acquire a COM after the initiation of the action, s*ee* Pa.R.C.P. 1042.3(a) (providing that in a professional negligence claim, the plaintiff "shall file with the complaint or within sixty days after the filing of a complaint, a certificate of merit . . ."), and that such time period may be extended as necessary, with good cause shown.  *Id.*, *Note.*

Finally, Defendants conclude that Plaintiffs' position that the statute of limitations did not commence until they received a final confirmation that Mrs. Nicolaou suffered from Lyme disease runs afoul of well-settled jurisprudence holding that a plaintiff need not have knowledge that she has a cause of action for the statute of limitations to commence; rather, in the absence of fraud or concealment, the statute begins to run when the tort is ascertainable.  Brief for Appellees at 25 (citing *DeMartino v. Albert Einstein Med. Ctr.*, 460 A.2d 295, 300 (Pa. Super. 1983)).

Thus, contrary to Plaintiffs' assertions, Defendants conclude that the statute of limitations was not tolled until Mrs. Nicolaou was certain that she had Lyme disease (*i.e.*, received the positive Lyme test) or until she could obtain a certificate of merit. Rather, they submit, the law clearly and fairly provided Plaintiffs with two years from when Nurse Rhoads diagnosed and treated Mrs. Nicolaou for probable Lyme disease to

---

[11] Defendants also reject Plaintiffs' reliance on the difference of opinions set forth by the majority and dissent below to establish that reasonable minds can differ regarding whether they exercised due diligence, asserting there is no requirement of unanimity of a panel decision as it relates to a discovery rule analysis.

take the necessary steps to investigate the claim and commence the action, including time to take the IGeneX test, retain a lawyer, and file suit. Defendants maintain that because Plaintiffs failed to take these steps within the time allotted by law, they are barred from pursuing their claims.[12]

### III. Applicable Law

As this case involves the grant of summary judgment, we begin by observing that summary judgment is only appropriate in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. *Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811,

---

[12] The American Medical Association and the Pennsylvania Medical Society ("*Amici*") have filed an *amicus curiae* brief in support of Defendants, advocating that we reject Plaintiffs' attempt to impose a definitive diagnosis requirement into the discovery rule standard because: in many cases either a definitive diagnosis is never given, confirmatory testing is unavailable, or confirmatory testing is disputed; requiring a definitive diagnosis would afford plaintiffs the means to control the limitations period by delaying medical testing or confirmation; our civil procedural rules do not contemplate that a plaintiff have a definitive diagnosis to bring a claim as they permit a plaintiff to initiate an action by writ of summons and allow for pre-complaint discovery and multiple extensions of the COM filing period; the COM procedural rules themselves do not require a definitive diagnosis, but require only "a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm," Pa.R.C.P. 1042.3(1); and imposing a definitive diagnosis requirement would transform Pennsylvania into a jurisdiction requiring actual knowledge of the legal injury, which has long been rejected under the discovery rule, and which the Legislature has not endeavored to change. *Amici* further contend that we should reject Plaintiffs' attempt to rewrite the current objective reasonable diligence standard to account only for what the plaintiff actually knew, as opposed to what she reasonably should have known through the exercise of due diligence.

818 (Pa. 2017) (citing *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 195 (2007)). An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. *Fine*, 870 A.2d at 857 n.3. Because the claim regarding whether there are genuine issues of material fact is a question of law, our standard of review is *de novo* and our scope of review is plenary. *Id.*

The present challenge to Plaintiffs' action is grounded upon an alleged failure to file the lawsuit in a timely manner. As noted, the statute of limitations for filing an action to recover damages for injuries to the person caused by the wrongful act, neglect, or negligence of another is two years. 42 Pa.C.S. § 5524(2). The Judicial Code provides that limitations periods are computed from the time the cause of action accrued. 42 Pa.C.S. § 5502(a). Generally, "a cause of action accrues, and thus the applicable limitations period begins to run, when an injury is inflicted." *Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009). "Once a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." *Fine*, 870 A.2d at 857. The running of the statute of limitations is not tolled by mistake, misunderstanding, or lack of knowledge. *Pocono International Raceway, Inc., v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983).

Acting as an exception to this general rule, however, is the discovery rule, which originated in cases where the plaintiff's injury or its cause was neither known nor reasonably ascertainable. *Fine*, 870 A.2d *at 858* (citing *Lewey v. H.C. Fricke Coke Co.*, 31 A. 261 (Pa. 1895) (holding that the statute of limitations did not preclude an action for trespass where the plaintiff could not have known that a trespasser had subterraneously extracted coal from his land) and *Ayers v. Morgan*, 154 A.2d 788 (Pa. 1959) (holding that because the plaintiff could not have known the source of his pain, the statute of limitations on his medical malpractice action did not commence until he discovered that

a sponge left in his abdomen by defendant after surgery had caused his injuries)).[13] Accordingly, the discovery rule tolls the statute of limitations where the plaintiff is reasonably unaware that he has been injured and that his injury has been caused by another party's conduct. *Fine,* 870 A.2d at 859. We have explained that reasonable diligence is not an absolute standard but, rather, is "what is expected from a party who has been given reason to inform himself of the facts upon which his right of recovery is premised." *Id.* at 858.

This Court has recognized that Pennsylvania's formulation of the discovery rule represents a more narrow approach and places a greater burden on plaintiffs than other jurisdictions because the "commencement of the limitations period is grounded on 'inquiry notice' that is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause.'"[14] *Gleason*, 15 A.3d at 484; *Wilson*, 964 A.2d at 364. Although this Court has

---

[13] The underlying purpose of the discovery rule is to ensure that persons who are reasonably unaware of an injury that is not immediately ascertainable have essentially the same rights as those who suffer an immediately ascertainable injury. *Hayward v. Medical Ctr. of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992).

[14] For the first time in this litigation and in a mere footnote in their appellate brief, Plaintiffs contend that we should transform this Commonwealth's discovery rule jurisprudence by adopting this author's position in *Wilson*, which advocated that we join the majority of jurisdictions that require specific medical evidence supporting a cause of action to commence the statute of limitations. *See* Brief for Appellants at 16, n.8 (citing *Wilson*, 964 A.2d at 371 (Baer. J., Concurring and Dissenting) (opining that based upon our adoption of the COM requirements and to protect innocent plaintiffs who are unsuspecting of a potential malpractice claim, this Court should change from an "inquiry notice" jurisdiction -- which ties commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or the precise cause of injury -- to a "legal injury" jurisdiction, which commences the statute of limitations when the plaintiff has actual or constructive knowledge of the cause of action associated with the harm)). *See Rathje* (continued…)

held expressly that a plaintiff's knowledge of "injury"' and "cause" does not require a precise medical diagnosis, we have clarified that a lay person is only charged with the knowledge communicated to him or her by the medical professionals who provided treatment and diagnosis. *Wilson*, 964 A.2d at 365. Balancing the rights of injured plaintiffs against the interests of defendants in being free from stale claims, the approach taken in Pennsylvania "has been to impose a relatively limited notice requirement upon the plaintiff, but to submit factual questions regarding that notice to the jury as factfinder." *Gleason,* 15 A.3d at 485; *Wilson*, 964 A.2d at 366 n.12.

Significant to this appeal, it is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law. *Gleason*, 15 A.3d at 485; *Fine*, 870 A.2d at 858-59. That being said, the objective reasonable diligence standard is "sufficiently flexible . . . to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question," *Fine*, 870 A.2d at 858 (citing *Crouse, v. Cyclops Industries*, 745 A.2d 606, 611 (Pa. 2000)), and, as such, "is to be applied with reference to individual characteristics." *Wilson*, 964 A.2d at 366.

---

(…continued)
*v. Mercy Hosp.*, 745 N.W.2d 443 (Iowa 2008) (explaining the difference between the "inquiry notice" discovery rule standard and the "legal injury" standard).

A majority of the Court in *Wilson* held that such a "foundational change" to this Commonwealth's discovery rule application was outside the scope of the grant of allocatur in that case. *Wilson*, 964 A.2d at 364. Regrettably, the same is true in the instant case. Because Plaintiffs did not preserve this foundational issue below and failed to offer developed argument on appeal, we await a future case to examine whether such a groundbreaking transformation of our discovery rule jurisprudence is warranted. Regardless of the potential merit of the claim, addressing such issue in the instant case without proper advocacy and where it is unnecessary to resolve the issues presented would be unwise and antithetical to principles of judicial restraint.

Under this reasonable diligence standard, a plaintiff's actions are examined to determine whether the plaintiff demonstrated "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Fine*, 870 A.2d at 858. It is the party that asserts application of the discovery rule that bears the burden of proving that reasonable diligence was exercised. *Gleason*, 15 A.3d at 485; *Wilson*, 964 A.2d at 362. Finally, as noted, because the reasonable diligence determination is fact intensive, the inquiry is ordinarily a question for the jury. *Id.*, 964 A.2d at 362. Nevertheless, "courts may resolve the matter at the summary judgment stage where reasonable minds could not differ on the subject." *Id.*

## IV. Analysis

Applying these principles to the facts presented, we hold that Pennsylvania's well-established general rule should apply, *i.e.*, that the factual issues pertaining to Plaintiffs' notice and diligence are for a jury to decide. Initially, we dispel some of Plaintiffs' contentions regarding the general application of the discovery rule, as we find them inconsistent with the aforementioned well-settled jurisprudence. As demonstrated *supra*, and contrary to their assertions, Plaintiffs bore the burden of proving that the discovery rule acted to toll the statute of limitations on their claims. *Gleason*, 15 A.3d at 485; *Wilson*, 964 A.2d at 362. Further, we agree with Defendants that the reasonable diligence standard is objective, examining not what the plaintiff actually knew, but what a reasonable person facing the same circumstances confronting the plaintiff at the time in question would have known upon the exercise of reasonable diligence. *Fine*, 870 A.2d at 858.

The logical extension of this rule of law is that the financial cost of a particular medical procedure, which could have served to alert a plaintiff of his injury and its nexus

to the defendant's conduct, is a permissible factor to consider in determining whether a plaintiff exercised reasonable diligence. To be precise, it is not the plaintiff's inability to pay for further medical testing that is dispositive, but whether a reasonable person confronting the same circumstances as the plaintiff, both financial and otherwise, would have deemed the additional cost in pursuing further diagnostic testing as prohibitive. Notably, also relevant to a determination of whether it was reasonable for a plaintiff to forego a recommended medical procedure is a consideration of the information provided to the plaintiff by prior medical professionals and/or previous medical testing regarding the need for such action.

Viewing the summary judgment record in the light most favorable to Plaintiffs as the non-moving party, we respectfully find that the Superior Court erred by concluding, as a matter of law, that Plaintiffs knew or should have known sometime between July and September of 2009 (the dates of the first few visits with Nurse Rhoads) that Mrs. Nicolaou suffered from Lyme disease and that her debilitating health problems could have been caused by Defendants' failure to diagnose and treat such condition. The Superior Court relied upon the fact that by such time an MRI had indicated that Mrs. Nicolaou had suffered from either Lyme disease or MS, Nurse Rhoads had informed Mrs. Nicolaou of a probable diagnosis of Lyme disease based upon her clinical symptoms, and some of Mrs. Nicolaou's symptoms had improved upon administration of antibiotics. When viewed in a vacuum, these facts may have alerted a reasonable person that she suffered an injury at the hands of medical professionals who failed to diagnose and treat her Lyme disease. Indeed, these circumstances may or may not persuade a jury to so conclude.

However, courts may not view facts in a vacuum when determining whether a plaintiff has exercised the requisite diligence as a matter of law, but must consider what

a reasonable person would have known had he or she been confronted with the same circumstances that Mrs. Nicolaou faced at the time. When viewing the evidence in this manner, it is simply uncertain whether Plaintiffs knew or should have known that Defendants' misdiagnosis caused Mrs. Nicolaou's injuries at the precise moment that Nurse Rhoads suggested the same. At that point in time, Mrs. Nicolaou had been repeatedly and definitively told by several health care professionals, most recently Dr. Gould, that her suspicions of Lyme disease were unfounded and that her inability to walk and function as she previously had done resulted from the devastating effects of MS.[15] Further, Mrs. Nicolaou had undergone, not one, but four separate Lyme disease tests, which had all produced negative results. Finally, there was evidence suggesting that Mrs. Nicolaou's lack of health insurance precluded her from paying the cost required to take the IGeneX Lyme disease test when Nurse Rhoads initially recommended.[16]

Until the conflicts in the record are resolved and inferences from the facts are drawn, the issue of whether Plaintiffs knew or should have known of the injury and that it was caused by Defendants' negligent conduct remains disputed. To find the discovery rule inapplicable, the Superior Court was required to undertake fact-resolution

---

[15] Indeed Dr. Gould testified that, to this day, he believes that Mrs. Nicolaou continues to suffer from MS. *See* Gould Deposition, at 68.

[16] Defendants' contention that there is no evidence of record to suggest that Mrs. Nicolaou lacked the funds to pay for the IGeneX test is unpersuasive. *See* Appellants' Answer to Appellees' Motion for Summary Judgment, at 52-53 (asserting that Mrs. Nicolaou did not act unreasonably in failing to obtain the IGeneX test sooner because she did not have the money to pay for the test); *see also* Rhoads Deposition, at 23 (providing that Mrs. Nicolaou informed Nurse Rhoads that she could not take the IGeneX Lyme disease test because she had no insurance and no money to pay the costs associated with the test). Whether Mrs. Nicolaou's belief in this regard was reasonable must be determined by a jury.

and inference-drawing functions, which are preserved for the jury. *See Fine*, at 862 (holding that "it is not the court's function upon summary judgment to decide issues of fact, but only to decide whether there is an issue of fact to be tried").

In summary, we conclude that it is within the province of a jury to determine whether an untrained lay person who had been repeatedly and definitively diagnosed with MS by several previous physicians, had four prior negative Lyme disease tests, and lacked health insurance to cover the costs of further diagnostic testing "reasonably should have known" that she suffered from Lyme disease after Nurse Rhoads informed her of a "probable" diagnosis of that disease based on her clinical symptoms, and when some of her symptoms improved after taking antibiotics prescribed for that condition. *See Wilson,* 964 A.2d at 365-66 (internal citations omitted) ("Pursuant to the application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue 'best determined by the collective judgment, wisdom and experience of jurors'"). Moreover, it is for the jury, and not a court, to determine whether a person in Mrs. Nicolaou's circumstances acted reasonably in delaying the administration of a fifth Lyme disease test to confirm Nurse Rhoad's probable diagnosis. We reach this conclusion keeping in mind that the appropriate formulation of discovery rule jurisprudence applies "a reasonable-diligence requirement, as opposed to an all-vigilance one." *Wilson*, 964 A.2d at 363.

*V. Conclusion*

Whether Plaintiffs knew or should have reasonably known that Mrs. Nicolaou's injuries were caused by Defendants' misdiagnosis is disputed and should be resolved at trial. Thus, Defendants' motion for summary judgment should have been denied. *See* Pa.R.C.P. 1035. Accordingly, we vacate the judgment of the Superior Court, reverse

the order granting summary judgment, and remand to the trial court for further proceedings consistent with this opinion.

Chief Justice Saylor and Justices Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht did not participate in the consideration or decision of this case.