2022 PA Super 126

| | | |
|---|---|---|
| GILDA DIDOMIZIO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JEFFERSON PULMONARY | : | No. 1999 EDA 2021 |
| ASSOCIATES AND ASTHMA ALLERGY | : | |
| AND PULMONARY ASSOCIATES, P.C. | : | |
| AND THOMAS JEFFERSON | : | |
| UNIVERSITY HOSPITAL AND | : | |
| JEFFERSON UNIVERSITY | : | |
| PHYSICIANS AND SANDRA B. | : | |
| WEIBEL, M.D. | : | |

Appeal from the Order Entered September 20, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 170801114

BEFORE:  McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                    **FILED AUGUST 2, 2022**

Gilda DiDomizio (DiDomizio) appeals from the order entered in the Court of Common Pleas of Philadelphia County (trial court) granting reconsideration and entering summary judgment in favor of Jefferson Pulmonary Associates and Asthma Allergy and Pulmonary Associates, P.C., Thomas Jefferson University Hospital, Jefferson University Physicians and Sandra B. Weibel, M.D. (Hospital Defendants).  She argues that the trial court erred in relying on ***Rice v. Dioceses of Altoona-Johnston***, 255 A.3d 237 (Pa. 2021), to find

_____

* Retired Senior Judge assigned to the Superior Court.

she had "inquiry notice" of her injury in 2015 making her action fall outside of the statute of limitations. We reverse.

**I.**

DiDomizio had a complex medical history during the relevant approximately five-year period that consisted of several physicians across disciplines, tests and diagnoses. We glean the following relevant facts and procedural history from the trial court's December 16, 2021 opinion and our independent review of the record.

**A.**

On August 16, 2011, DiDomizio, a woman in her fifties with an approximately thirty-year history of smoking, went to the Thomas Jefferson University Hospital (TJUH) Emergency Room in Philadelphia because she was coughing up blood. An endobronchial biopsy taken as part of her evaluation yielded insufficient material for a diagnosis and the report stated that rebiopsy should be considered if clinically warranted. In September 2011, DiDomizio followed up with TJUH pulmonary physician Sandra B. Weibel, M.D.

Between 2011 and 2015, DiDomizio continued to see doctors at TJUH approximately every three months for her chief complaint of feeling run down and generally ill. A November 14, 2011 PET scan was normal. In June 2012,

results of a CT scan ordered by Dr. Weibel was possible for sarcoidosis.[1]

DiDomizio was told to continue her course of treatment, which included a regimen of methotrexate and prednisone. In 2012, the cardiology department saw DiDomizio for palpitations and noted that pulmonary had a working diagnosis of sarcoidosis that had not been definitively proven, and they recommended a lung biopsy that she declined due to her history of significant issues. (**See** Report of Plaintiff's Expert, Edward Eden MB.BS, at 5). On February 12, 2013, Dr. Weibel advised DiDomizio that a recent (February 7, 2013) CT scan showed an increased mass and although it was possible this was sarcoidosis, cancer was always a possibility, and more diagnostic testing (bronchoscope) was required, but DiDomizio declined. (**See** N.T. Dr. Weibel Deposition, 3/27/19, at 59-60). (**See** Amended Complaint, at ¶¶ 14-19); (Plaintiff's Expert Report, at 4-5); (Hospital Defendants' Motion for Summary Judgment, at ¶¶ 8, 9).

A March 2, 2013 PET scan resulted in non-specific findings that revealed increased metabolic activity in two of DiDomizio's lung nodes. Although this finding was suspicious, Dr. Weibel's progress notes do not reflect that she

---

[1] "Sarcoidosis is a chronic disease characterized by the presence of granulomas in a variety of organs but most prevalent in the lungs. Pulmonary sarcoidosis may be suspected when the patient presents with [enlarged lymph nodes] and/or pulmonary opacities or nodules. Respiratory symptoms of sarcoidosis may include cough, progressive dyspnea and chest pain and may be accompanied by fatigue and weight loss." (DiDomizio's Brief, at 5 n.1) (record citation omitted).

conveyed the information to DiDomizio.[2]  (**See** N.T. Dr. Weibel Deposition, at 56-60); (Plaintiff's Expert Report, at 6).  DiDomizio's last outpatient visit with Dr. Weibel occurred on February 9, 2015.

A March 23, 2015 CT scan and biopsy did not show evidence of malignancy or granulomatous inflammation and the related report recommended further investigation if malignancy was clinically suspected.  On June 15, 2015, DiDomizio requested a second opinion from TJUH pulmonary physician Michael Unger, M.D. because her symptoms were not improving.  Dr. Unger confirmed the sarcoidosis diagnosis and recommended that she continue her treatment of prednisone.  (**See** Amended Complaint, at ¶¶ 19, 20, 22); (Motion for Summary Judgment, at ¶ 8); (Plaintiff's Expert Report, at 6).

DiDomizio was admitted to TJUH from July 13, 2015, to July 21, 2015, for evaluation due to left calf pain and shortness of breath.  In the TJUH discharge summary, pulmonary attending physician Robert R. Manoff, M.D., noted DiDomizio's "purported sarcoidosis," diagnosis in 2011 and that a CT scan completed upon her recent admission showed a pulmonary embolism and a mass in her lung.  She underwent a bronchoscopy and was diagnosed

---

[2] DiDomizio represents that Dr. Weibel did not communicate the finding to her.  (**See** DiDomizio's Brief, at 7).

with cancer.  (Discharge Summary, 7/27/15, at 1); (DiDomizio Deposition, 3/07/19, at 130).

On July 28, 2015, DiDomizio had an outpatient consultation with TJUH oncologist Jennifer M. Johnson, M.D. PhD.  She had radiation treatment from August 5, 2015, through August 20, 2015.  Upon completion of this treatment, TJUH physicians reported that her cancer was in remission.  (**See** Amended Complaint, at ¶¶ 21, 23, 24); (Motion for Summary Judgment, at ¶ 9); (Plaintiff's Response in Opposition to Summary Judgment, at ¶ 9).

In December 2015, DiDomizio began to feel ill again, and she returned to TJUH for treatment in January 2016 when her health continued to decline. An April 11, 2016 biopsy showed a right lung pulmonary adenocarcinoma.  On April 14, 2016, DiDomizio saw Dr. Johnson, who noted progression of her lung cancer and that her diagnosis of sarcoidosis precluded use of immune oncologic agents to treat it.  (**See** Dr. Johnson Progress Note, 4/14/16, at 1-2).

## B.

On April 20, 2016, DiDomizio saw oncologist Charu Aggarwal, M.D., at Penn Medicine for an opinion regarding further management and she agreed that using immunotherapy was challenging, given her history of sarcoidosis. (**See** Plaintiff's Response in Opposition to Summary Judgment, at ¶ 9); (Dr. Aggarwal Progress Notes, 4/20/16, at 4) (pagination provided).

In May 2016, DiDomizio sought treatment for the adenocarcinoma at The Hospital at the University of Pennsylvania (HUP). On July 6, 2016, DiDomizio was seen by Mary Katherine Porteous, M.D., for a pulmonary consult. Dr. Porteous noted that she spoke with DiDomizio's primary pulmonologist at TJUH and confirmed that there was no pathological confirmation of sarcoidosis, and it was a presumptive diagnosis based on her chest CT since she was too sick for transbronchial biopsies. (Progress Note of Dr. Porteous, 7/28/16, at 1). "Non-necrotizing granulomas were never isolated." (*Id.*). In a December 9, 2016 progress note, Dr. Porteous observed that DiDomizio had a history of "possible sarcoidosis (based on imaging but NO biopsy, but then was diagnosed with cancer, so unclear if actually was present[.]" (Dr. Porteous Progress Note, 12/09/16, at 1). She commented that:

> Ms. DiDomizio was diagnosed with sarcoidosis in 2011 … although diagnosis was made based on clinical findings and no pathologic evidence of sarcoidosis was obtained. She has not had a chance to bring the 2011 imaging. Her current CT findings are more suggestive of consolidative fibrotic changes likely a combination of radiation fibrosis and adenocarcinoma. Given the lack of pathologic proof of sarcoidosis, her prednisone was weaned …. As unilateral effusion is more likely related to malignancy or radiation instead of sarcoidosis, risk/benefit ratio of steroids for possible sarcoidosis weighs in favor of discontinuing steroids at this point.
> …

(*Id.* at 4).

On May 17, 2017, Dr. Porteous again noted that DiDomizio was diagnosed with sarcoidosis in 2011 based on clinical findings, not pathologic evidence, despite numerous bronchoscopies, and that "[h]er current CT

findings are more suggestive of consolidative fibrotic changes likely a combination of radiation fibrosis and adenocarcinoma (rather than sarcoidosis)." She continued, "[e]ven if she does have sarcoidosis, her radiographic disease does not warrant prednisone at this time. … Since cannot exclude sarcoidosis, will check EKG and optho exam yearly[.]" (Dr. Porteous Progress Note, 5/17/17, at 4); (*see* Amended Complaint, at ¶¶ 25-28).

## II.

### A.

On August 15, 2017, DiDomizio commenced a medical malpractice action by writ of summons against the Hospital Defendants,[3] filed her complaint on November 20, 2017, and the amended complaint on January 28, 2018. The amended complaint claimed that the Hospital Defendants misdiagnosed her with sarcoidosis, and this misdiagnosis delayed the cancer diagnosis and limited her treatment options. She maintains that it was not until she sought a second opinion at HUP in 2016 regarding her lung cancer treatment that she had reason to question her sarcoidosis diagnosis. In their April 2, 2018 answer with new matter, the Hospital Defendants raised, *inter alia*, the defense that DiDomizio's claims were barred by the statute of limitations, which DiDomizio denied in her response.

---

[3] The complaint initially named Dr. Unger as a Hospital Defendant, but he is no longer a party in the matter.

On November 4, 2019, the Hospital Defendants filed the motion for summary judgment in which they argued that DiDomizio knew she had been diagnosed with lung cancer prior to her July 21, 2015 discharge from TJUH. Therefore, because she did not file her cause of action until August 15, 2017, more than two years after her diagnosis and treatment by Dr. Weibel, her claims are barred by the statute of limitations. (**See** Motion for Summary Judgment, at ¶¶ 16, 17).

DiDomizio responded that the relevant date for the purpose of the statute of limitations was when she knew or should have known she had been misdiagnosed, and that her symptoms were related to lung cancer, not sarcoidosis. She maintains that because her medical records from both TJUH and HUP support her affidavit statements that she did not suspect she had been misdiagnosed with sarcoidosis until July 2016 when she sought a second opinion from Dr. Porteous, she commenced the action within the statute of limitations. (**See** Response in Opposition to Motion for Summary Judgment, at ¶ 9, Exhibit A, DiDomizio Affidavit).

The trial court denied the motion for summary judgment on January 23, 2020.

**B.**

On August 24, 2021, the Hospital Defendants filed a motion for reconsideration of the trial court's January 23, 2020 order in which they stated that they received the July 1, 2019 and January 8, 2020 medical records of

Dr. Porteous that they did not have when they filed the motion for summary judgment, which specifically state that sarcoidosis cannot be excluded. They also argued that the Pennsylvania Supreme Court's decision in **Rice**, which was filed between the trial court's denial of the motion for summary judgment and the filing of the motion for reconsideration, supported their position that the statute of limitations began to run when DiDomizio discovered she had lung cancer in July 2015, not when she consulted with Dr. Porteous in 2016. Based on **Rice** and because it "committed error in its application of the law to this case," the trial court granted the Hospital Defendants' motion for reconsideration and entered summary judgment in their favor. (Trial Court Opinion, 12/16/21, at 7-8). DiDomizio timely appealed and complied with Rule 1925. **See** Pa.R.A.P. 1925(b).

DiDomizio raises one issue for our review: "Did the trial court err in granting Summary Judgment[4] to [Hospital] Defendants by relying for support

---

[4] "In determining whether the lower court erred in granting summary judgment, the standard of review is *de novo* and the scope of review is plenary." **Valentino v. Philadelphia Triathlon, LLC**, 209 A.3d 941, 950 (Pa. 2019). To survive a defense motion for summary judgment, a plaintiff must "adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." **Ario v. Ingram Micro, Inc.**, 965 A.2d 1194, 1207 n.15 (Pa. 2009).

"[S]ummary judgment will be granted only in those cases which are free and clear from doubt." **See Washington v. Baxter**, 719 A.2d 733, 737 (Pa. 1998). "Where the facts can support conflicting inferences, it cannot be said that the case is free from doubt and thus ripe for summary judgment." **Id**. at
*(Footnote Continued Next Page)*

on the distinguishable facts and/or statements of law in the [Pennsylvania] Supreme Court's decision in **Rice** … related to application of the discovery rule to the statute of limitations?" (DiDomizio's Brief, at 2-3).[5]

## III.

## A.

DiDomizio contends that the trial court erred in granting summary judgment based on **Rice** because it is factually distinguishable since there was

_____

740 n.10. "[A]n appellate court may reverse the entry of summary judgment only where it finds that the trial court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to judgment as a matter of law." **Phillips v. Cricket Lighters**, 841 A.2d 1000, 1004 (Pa. 2003).

The standard of review for issues involving the interpretation of a statute of limitations is *de novo* and the scope of review is plenary. **See Erie Ins. Exchange v. Bristol**, 174 A.3d 578, 585 n.13 (Pa. 2017).

[5] The Hospital Defendants argue that DiDomizio waived her issue by failing to either properly plead facts supporting the discovery rule in her amended complaint or to raise the rule in response to their new matter. (**See** Hospital Defendants' Brief, at 7-9); **see also Prevish v. Northwest Med. Ctr. Oil City Campus**, 692 A.2d 192, 197 (Pa. Super. 1997) ("A plaintiff who wishes to assert the discovery rule may do so in one of two ways:  1) by pleading in the complaint sufficient facts to sustain application of the rule; or 2) by waiting until the defendant asserts a statute of limitations defense in new matter and then raising the discovery rule in a responsive pleading.") (citation omitted). However, a review of her pleadings reveals that she claimed that Dr. Johnson told her that her 2013 PET exam was concerning and Dr. Porteous alerted her that her sarcoidosis diagnosis was incorrect because her symptoms were more probably related to cancer.  She stated her claims were brought either within the applicable statute of limitations or "based upon when she knew and/or should have known that the negligence of the Defendants caused [her] injuries …." (Response to New Matter, at ¶ 6); (**see also** Amended Complaint, at ¶ 27).  This was sufficient to preserve her discovery rule claim.

an issue of material fact regarding when she had notice of her possible misdiagnosis. She argues that the issue of when she reasonably discovered her injuries and their cause were issues of fact for the jury, and that she only had reason to question her diagnosis when it was questioned in 2016 when she became aware that she did not have sarcoidosis. (*See id.* at 11-20).

The Hospital Defendants respond that the discovery rule did not toll the running of the statute of limitations because any ordinary, reasonable person who was diagnosed with lung cancer on or before July 21, 2015, after allegedly experiencing signs and symptoms of cancer earlier, possessed sufficient critical facts to put her on notice to make an inquiry of the possible misdiagnosis. Because the action was not filed until August 15, 2017, more than two years after she was placed on inquiry notice, they contend her action is out of time.

**B.**

Statutes of limitations are rules of law that set time limits for bringing legal claims. The time to file begins running "from the time the cause of action accrued[.]" 42 Pa.C.S. § 5502(a).[6] "Normally, a cause of action accrues when an injury is inflicted. Thus, the clock begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or

---

[6] Negligence claims for alleged misdiagnosis are subject to a two-year statute of limitations. *See* 42 Pa.C.S. § 5524(7).

- 11 -

misunderstanding do not toll the running of the statute of limitations[.]" ***Rice***,

***supra*** at 246 (citations and internal quotation marks omitted).

> However, where the complaining party is reasonably unaware that his or her injury has been caused by another party's conduct, the discovery rule suspends, or tolls, the running of the statute of limitations. To successfully invoke the discovery rule, a party must show the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause. A party fails to exercise reasonable diligence when it fails to make an inquiry when the information regarding the injury becomes available.

***Mariner Chestnut Partners, L.P. v. Lenfest***, 152 A.3d 265, 283 (Pa. Super.

2016) (citations and quotation marks omitted). Although the reasonable

diligence standard is an objective one, "it is to be applied with reference to

individual characteristics." ***Wilson v. El-Daief***, 964 A.2d 354, 365 (Pa. 2009)

(citation omitted). "Pursuant to the application of the discovery rule, the point

at which the complaining party should reasonably be aware that he has

suffered an injury is a factual issue best determined by the collective

judgment, wisdom and experience of jurors." ***Id.*** (citations omitted).

> [Indeed], [t]he polestar of the Pennsylvania discovery rule is not a plaintiff's actual acquisition of knowledge but whether the information, through the exercise of due diligence, was knowable to the plaintiff. The failure to make inquiry when information is available is failure to exercise reasonable diligence as a matter of law.

***Borough of Mifflinburg v. Heim***, 705 A.2d 456, 467 (Pa. Super. 1997),

*appeal denied*, 794 A.2d 359 (Pa. 1999) (citation omitted).

Our Supreme Court in ***Rice*** reaffirmed that inquiry notice "t[ies]

commencement of the limitations period to actual or constructive knowledge

of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Rice*, *supra* at 247 (citing *Wilson v. El-Daief*, 964 A.2d 354 (Pa. 2009)).[7]

## C.

DiDomizio claims that the trial court misapplied *Rice* to grant summary judgment in this case because *Rice* is factually distinguishable and whether she was on inquiry notice was an issue of fact for the jury. (*See* DiDomizio's Brief, at 11-20).

In *Rice*, the plaintiff brought a 2016 action against the diocese and bishops for fraud and related claims related to their protection of a priest who had sexually abused her twenty-five years earlier. She maintained she had no way to know the diocese's role in the sexual assaults until proof of them and the diocese's knowledge thereof were released in a referral by the district attorney and in the grand jury's subsequent findings that the diocese was

---

[7] DiDomizio notes that contrary to the Hospital Defendants' assertions, reconsideration of the trial court's order denying summary judgment was not warranted because *Rice* did not represent a change in the law, but merely reaffirmed prior decisions that declined to adopt the more liberal view of the discovery rule, and the new medical records they obtained merely restated previously produced facts and opinions. (*See* DiDomizio's Brief, at 11). Although we agree, this is not dispositive, as a material change in the law and new evidence were not necessary for the court to reconsider the propriety of its own interlocutory order, which it had broad discretion to do, even had it elected to do so *sua sponte*. *See Key Automotive Equipment Specialists, Inc. v. Abernethy*, 636 A.2d 1126, 1128 (Pa. Super. 1994) ("It is well settled that a trial court has the inherent power to reconsider its own rulings.").

aware for years of its clergy's criminal actions. Our Supreme Court held that the "inquiry notice approach to the discovery rule required Rice to investigate the Diocese as a potential additional cause of her injuries during the limitations period," which began to run at the time of the last assault in 1981. **Rice**, **supra** at 255.

DiDomizio maintains that the foregoing facts on which the Supreme Court based its holding are distinguishable from those presented here. She argues that it was not until 2016 when Dr. Johnson informed her that there were suspicious findings on her March 2013 PET scan and Dr. Porteous raised the possibility of sarcoidosis misdiagnosis, that she was on inquiry notice that there were indications of cancer in 2013 and that Dr. Weibel's reliance on the misdiagnosis resulted in the delayed cancer diagnosis. She claims that, unlike the plaintiff in **Rice**, "who knew she was injured and who caused her injury," she had no reason to suspect that she had been injured to start the running of the inquiry notice clock until 2016 when she was informed of the misdiagnosis and that it was for the jury to make the determination of whether her actions were reasonable. (DiDomizio's Brief, at 13).

She maintains that her case is more similar to **Nicolaou v. Martin**, 195 A.3d 880 (Pa. 2018). In **Rice**, our Supreme Court described the complicated medical history underlying **Nicolaou** as follows:

> **Nicolaou** involved a medical malpractice case for an injury arising out of the failure to diagnose and treat Lyme disease. Nicolaou was bitten by a tick sometime in 2001. Over the next eight to nine years, she sought treatment for symptoms of an

- 14 -

unknown etiology from several providers, who ordered a total of four Lyme disease tests, all of which came back negative. An MRI reported findings "seen in infectious or inflammatory demyelinating process, such as [MS] or Lyme Disease[.]" *Nicolaou*, 195 A.3d at 883 (quoting record). Based on the MRI, a doctor informed Nicolaou that she suffered from multiple sclerosis ("MS"). Notwithstanding, Nicolaou continued to believe that she may have had Lyme disease. In July of 2009, she began seeing a nurse who relayed her opinion that Lyme disease, not MS, was the cause of Nicolaou's problems and prescribed antibiotics for Lyme disease to see how Nicolaou responded. She responded positively to the treatment. During one of these visits, the nurse offered the option of an advanced test for Lyme disease that cost approximately $250. Nicolaou initially declined but later decided to take the test, which came back positive for Lyme disease. Within two years of receiving the results, Nicolaou filed suit against various defendants for their misdiagnoses. The trial court granted summary judgment in favor of the defendants based on expiration of the statute of limitations.

The Superior Court affirmed, holding that as early as July of 2009 Nicolaou should have known as a matter of law that she suffered from Lyme disease. That conclusion was based on the MRI test which had indicated that Nicolaou suffered from either MS or Lyme disease, the nurse's opinion, the availability of an advanced test that would provide a definitive answer and her postponed decision to take it. [The Pennsylvania Supreme Court] reversed, holding that the Superior Court erred by isolating those facts indicating a diagnosis of Lyme disease from the entirety of her history of seeking a diagnosis and appropriate treatment. The Superior Court overlooked the constellation of contradictory facts; namely, everything that Nicolaou did, learned, and was told by medical professionals during the entire history of her efforts to treat her symptoms. *Nicolaou*, 195 A.3d at 894. [The Court] cautioned that "courts may not view facts in a vacuum when determining whether a plaintiff has exercised the requisite diligence as a matter of law[.]" *Id.*

… The plaintiff's cause of action accrued when she knew or should have known that Lyme disease was not treated as a result of repeated misdiagnosis by her health care providers. Given the lengthy history of attempted contradictory diagnosis and treatment, the date of accrual could not be determined as a matter

of law by the court and a jury would decide when she knew of an injury redressable by a lawsuit.

***Rice***, ***supra*** at 250-51.

Based on those facts, our Supreme Court held that the grant of summary judgment was improper, stating that "courts may not view facts in a vacuum when determining whether a plaintiff has exercised the requisite diligence as a matter of law, but must consider what a reasonable person would have known had he or she been confronted with the same circumstances. ***Id.*** at 894 (2018). It went on to conclude that it was in the province of a jury to determine whether an untrained lay person reasonably should have known that he or she had been misdiagnosed.

The facts in this case are more akin to ***Nicolaou*** than ***Rice***. Here, DiDomizio was an individual in her fifties with a thirty-year smoking history. There are approximately five years of progress notes and test results reflecting different diagnoses of masses on her lungs and recommendations by doctors across disciplines. DiDomizio had previously suffered "significant issues" with diagnostic procedures. (N.T. Dr. Weibel Deposition, at 55). It appears to this Court that, even after her visits with Dr. Porteous and Dr. Johnson, it is not clear exactly what was communicated to DiDomizio and when, and if her understanding of the diagnoses and test results was reasonable. Specifically, it is not clear if Dr. Weibel communicated her concerns about the March 2013 PET scan, despite her statement that the test revealed suspicious increased activity. (***See id.*** at 60). She told DiDomizio that she would need to undergo

diagnostic tests to confirm any diagnoses related to a mass revealed on an earlier 2013 CAT scan with a significant size increase, but that due to her "previous significant issues," she declined to do so. (**See id.** at 55). However, under the circumstances, whether this decision not to undergo this diagnostic testing in 2013 or to investigate whether her lung masses had been misdiagnosed as sarcoidosis in 2015 after her cancer diagnosis is a question better left to a jury. While it is undisputed that DiDomizio knew as of 2015 that she had cancer, it is not clear from her progress notes if Dr. Porteous believed the sarcoidosis diagnosis was wrong and delayed the cancer diagnosis or whether it was an additional diagnosis that might or might not have been correct.

Where so much uncertainty remains about what was reasonable in this case, we find that, similar to **Nicolaou**, "[g]iven the lengthy history of attempted contradictory diagnosis and treatment, the date of accrual [for inquiry notice purposes] could not be determined as matter of law by the court and a jury would decide when she knew of an injury redressable by a lawsuit." **Nicolaou**, **supra** at 894. Accordingly, we conclude that the trial court erred in granting the Hospital Defendants' motion for summary judgment. **See id.** at 895 ("We reach this conclusion keeping in mind that the appropriate formulation of discovery rule jurisprudence applies a reasonable diligence requirement, as opposed to an all-vigilance one.") (citation and internal quotation marks omitted).

Order reversed.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/2/2022