J-A30008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SEAN BERTON AND JOY BERTON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| NATIONAL COLLEGIATE ATHLETIC | : | No. 301 EDA 2025 |
| ASSOCIATION | : | |

Appeal from the Judgment Entered January 17, 2025
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  210900168

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED FEBRUARY 27, 2026**

Sean Berton and Joy Berton,[1] h/w (collectively, the Bertons), appeal from the judgment, entered in the Court of Common Pleas of Philadelphia, following the entry of a compulsory nonsuit in favor of Appellee, the National Collegiate Athletic Association (NCAA).  While we sympathize with the Bertons' plight and, in particular, Sean's significant health issues, we find that because the Bertons were on inquiry notice such that the statute of limitations did not toll their action, the court correctly concluded that non-suit was proper.  Thus, we affirm.

---

[1] For ease of reference we will refer to Sean Berton and Joy Berton, in their individual capacities, as Sean and Joy, respectively.

From 1998-2002, Sean played NCAA Division I football[2] at West Virginia University (WVU) and North Carolina State University (NCSU) (collectively, the Schools).[3] Sean played his last college football game in the Gator Bowl in January 2003. Although not drafted, Sean signed with the Minnesota Vikings and played professional football for the franchise from September 2003 through 2004. In 2005, the Vikings cut Sean from their roster and he was picked up on waivers by the New York Giants. Sean played for the Giants until May 2006, when he suffered a career-ending knee injury.

Sean recalls suffering concussions, some resulting in loss of consciousness, while playing professional football. He also testified that he suffered a concussion in college, rendering him unconscious, when he was hit over the head with something "like a pipe" at a WVU party. *See* N.T. Jury Trial, 10/22/24, at 43-44. Although never diagnosed as minor concussions, Sean remembers having sustained "bell-ringing" hits during his collegiate career. *Id.* at 32-43. However, Sean testified that he was never diagnosed with a concussion playing college football. *Id.* at 46

On June 13, 2011, Sean was referred to Robert Cantu, M.D., a neurologist, for an evaluation due to complaints, dating back to 2005, of dizziness, depression, fogginess, headaches, irritability, and difficulties with memory, balance, and concentration. *See* N.T. Jury Trial, 10/18/24, at 53-

---

[2] Sean played the positions of tight end and H-Back.

[3] Sean played four full seasons and one red-shirt season at the universities.

Doctor Cantu ordered a series of blood tests, an MRI, and genetic and neuropsychological testing. *Id.* at 54-55. The results of the testing showed Sean had borderline low birth hormone and low testosterone. *Id.* at 55. Sean's MRI was read as "normal" and a mental examination showed he was "alert, oriented to person, time, and place." *Id.* at 56. Doctor Cantu ultimately diagnosed Sean with "post-concussion syndrome," a condition, he testified, that has symptoms that generally do not worsen with time. *Id.* at 59-60. Doctor Cantu also testified that post-concussion syndrome "itself is not a neurodegenerative disease in the sense of persistent symptoms that get [worse] over time." *Id.* at 61.

In January 2020, Sean visited Janis Rubin, M.D., where he told her that he had seen a psychiatrist in 2006 for lack of concentration and focus issues and was prescribed Adderall at that time. *Id.* at 100-02. Doctor Rubin's office notes also indicated that Sean told her "he did not have issues with concentration and focus until his NFL career. He reports that he did not have issues in high school and college, no treatment for ADD at that time." *Id.* at 102. Moreover, Sean testified he did not know "one way or the other at that time whether he had had a concussion on a college football field." *Id.* at 104.

On September 3, 2021, the Bertons filed a complaint against the NCAA[4] alleging negligence, fraudulent concealment, constructive fraud, and loss of

---

[4] The Bertons claim that the trial court has jurisdiction over the matter because the NCAA is an association the "regularly conducts business or [] association activity" in Philadelphia County. *See* Pa.R.C.P. 1006(a.1), (b).

- 3 -

consortium.[5] In the complaint, the Bertons alleged that since "the fall of 2011, Sean has suffered from symptoms later diagnosed as chronic traumatic encephalopathy [(CTE), a] neurodegenerative brain disease caused by repetitive head trauma in football and boxing." Plaintiffs' Complaint, 9/3/21, at 2. These symptoms, the Bertons claim, were a direct and proximate result of "concussive and sub-concussive injuries" Sean sustained while playing college football. *Id.* The Bertons averred that the NCAA breached its duty to Sean by "failing to establish, implement, and supervise rules of the game[,] failing to enforce an effective concussion protocol[, and] concealing material information from [him] and his parents[.]" *Id.* at 44. They also alleged that the NCAA: failed to warn Sean that "the game of football [i]s inherently unsafe with respect to long-term brain health;" should have changed the rules of the game to make it "reasonably safe;" and failed to warn Sean that its promises "to protect his health and well-being were not reliable and ignored numerous and long-standing recommendations made by medical professionals and experts in neurology." *Id.* at 47. As a result of the NCAA's actions and inaction, the Bertons claim that Sean suffers from "substantial" physical injuries, including "permanent physical disability associated with degenerative

_____

[5] Joy, who married Sean in February 2014, claims that she has been "deprived of the services, society, and companionship of her husband[,] will continue to be required to spend money for [his] medical care and . . . treatment[,] and will continue to be deprived of earnings [that Sean] would have received but for his disability." Complaint, 9/3/21, at 53.

brain disease, pain and suffering, post-concussive symptoms, and economic loss." *Id.* at 49.

On October 26, 2021, the NCAA filed an answer with new matter raising, among other things, the defenses of voluntary assumption of the risk and the statute of limitations. *See* Answer and New Matter, 10/26/21, at 47-48. On August 7, 2023, the NCAA filed a motion for summary judgment, asserting that the Bertons' claims are "time-barred" due to the two-year statute of limitations, 42 Pa.C.S.A. § 5524.[6] The Bertons opposed the NCAA's motion, alleging that their complaint was not barred by the statute of limitations due to a tolling agreement in a federal district court matter,[7] the discovery rule,

_____

[6] The case was originally assigned to the Honorable Denis Cohen until October 2024. In September 2023, the Honorable James Crumlish, III, ruled on the NCAA's motion for summary judgment and reconsideration motion. Then, in October 2024, motions were reassigned to the Honorable Carmella Jacquinto. Judge Jacquinto ruled on several motions *in limine*, motions to strike, motions for jury instructions and sanctions, and motions to quash. Judge Jacquinto presided over the instant trial and, ultimately, ruled on the NCAA's motion for compulsory nonsuit.

[7] ***Arrington, et al. v. NCAA***, No. 1:11-CV-06356 (N.D. Ill., filed Sept. 12, 2011) and ***Owens, et al. v. NCAA***, No. 1:11-CV-06816 (N.D. Ill., filed Sept. 28, 2011), are class action lawsuits filed in 2011 against the NCAA and helmet manufacturers in the United States District Court for the Northern District of Illinois on behalf of a putative class of former college athletes, including Berton, for permanent long-term injuries sustained as a result of sports-related concussions. Those cases involved claims that the NCAA had breached a duty to student-athletes at NCAA member institutions by failing to adopt appropriate protocols regarding concussions. In April 2015, the NCAA entered into a class action settlement agreement and release agreeing to toll all the claims in ***Arrington*** "until the Court has ruled on the Motion for Final Approval filed by Class Counsel of this Settlement, at which point the tolling period on such claims will end except as otherwise specified in this Settlement
*(Footnote Continued Next Page)*

the doctrine of fraudulent concealment, and the "two[-]disease rule."[8]  On November 13, 2023, the trial court denied summary judgment, reserving the issue of the statute of limitations for trial.  *See* Order, 11/13/23.[9]  The NCAA filed a motion to reconsider, which the court denied on November 29, 2023.[10]

_____

Agreement."  Exhibit 1, Second Amended Class Action Settlement Agreement and Release, 8/13/19, at 66.  On August 13, 2019, the Court granted the motion for final approval of the agreement, entering an order certifying the matter for settlement purposes.  The NCAA would argue that even if the tolling agreement applied to the instant matter, the statute was only tolled from September 12, 2011 until August 13, 2019.  The Bertons, on the other hand, argue that the tolling period did not end until November 4, 2019, when the Third Circuit's appeal of the matter was resolved.

Although discussed at the nonsuit hearing, the Bertons do not raise the argument that the tolling agreement applies in the instant matter in either their post-trial motion, Pa.R.A.P. 1925(b) statement, or appellate brief.  Thus, it is waived for purposes of appeal.  *See* Pa.R.A.P. 1925(b)(4)(vii); Pa.R.A.P. 2116.

[8] The two-disease rule has been held to apply to asbestos cases, recognizing that two different diseases can be suffered by those exposed to asbestos.  *See Zieber v. Bogert*, 773 A.2d 758, 761 (Pa. 2001).

[9] The trial court's order stated that "the evidence suggest[s] that Plaintiff Sean Berton had knowledge that he had experienced concussions and had ongoing issues related to concussions well prior to the initiation of this lawsuit and prior to the tolling agreement[, *see supra* at n. 6,] creating a credibility issue as to Plaintiff's asserted ignorance of a claim arising out of his college football injuries."  Order, 11/23/23.

[10] Prior to trial the court ruled upon numerous motions in *limine* filed by both parties.  Ultimately, the court ruled that, among other things, the Bertons were precluded from:  from introducing evidence and argument regarding the NCAA's conduct after 2002; eliciting opinion testimony from medical providers who did not provide an expert report; introducing evidence or argument regarding other injuries to college football players or other lawsuits and settlements; and introducing evidence or argument regarding CTE among NFL players.  *See* Order, 10/15/24.

A jury trial commenced on October 15, 2024, before the Honorable Carmella Jacquinto. In the middle of trial, counsel agreed that the court would read the following instruction to the Bertons prior to their testifying:

> THE COURT: Okay. This is agreed to by and between counsel. I'll start with Joy Berton. The instruction that you want to give her: You must limit your testimony to your personal knowledge and observations. In your testimony you may not use the terms CTE,[11] dementia, brain disease, or any other term attempting to convey these concepts. You may not testify to any opinions you may have including, without limitation, any diagnosis your husband has received or that you believe he has received, any beliefs or opinions you have formed based on discussions with any expert witness, physician, neuropsychologist, or lawyer. Any opinion regarding the cause of your husband's condition. Any comparison of your husband's condition to any other person, whether a former football player or otherwise.
>
> **Is that agreed by both counsel?**
>
> [Defense Counsel]: Yes, Your Honor.
>
> **[Plaintiffs' Counsel]: Yes, Your Honor.**
>
>                 \*     \*     \*
>
> THE COURT: Okay. Now, for Sean Berton, this is the instruction that's been agreed upon by both counsel for me to read to him as well before he testifies: You must limit your testimony to your personal knowledge and observations. In your testimony, you may not use the terms CTE, dementia, brain disease, or any other

---

[11] Because a clinician can neither confirm nor rule out a CTE diagnosis in a living individual using current technology, the court excluded any testimony relating to such term and related terms like TES and mild traumatic brain injury–only permitting expert medical testimony regarding Berton's cognitive loss. ***See In re NFL Concussion Injury Litigation***, 821 F.3d 410, 441 (3rd Cir. 2016). ***See also*** N.T. Jury Trial, 10/18/24, at 18-20. Because TES was not a recognized term in the medical community until 2014, the court found it was improper to admit testimony on that diagnosis because the NCAA could not have been aware that it had a duty to prevent something that did not exist at the time Sean played NCAA Division I football from 1998-2003.

term attempting to convey these concepts—and we all know that also means, TES—and that's to both. You may not testify to any opinions you may have, including, without limitation, any diagnosis you have received or believe you have received using the terms I just read to you, your beliefs or opinions about your condition that you have formed—that you have formed based on discussions with any expert witness, physician, neuropsychologist, or lawyer. Any opinion regarding whether your condition is permanent or can be treated or improved. Any opinion regarding the cause of your condition. Any comparison of your condition to any other person, whether a former football player or otherwise.

**Is that both—is that agreed upon by both counsel?**

**[Plaintiffs' Counsel]: Yes.**

[Defense Counsel]: Yes, Your Honor.

N.T. Jury Trial, 10/21/24, at 3-11 (emphasis added). Following this exchange, the court read the above instructions to the Bertons, out of the presence of the jury, and then provided them the instructions in writing so that they could read them over before taking the stand to testify.[12] *Id.* at 10-11.

Sean testified at trial that during a 2016 Workers Compensation Proceeding (WCP) he testified before a judge that he had a hit when he was playing for the Vikings in 2004 that caused him to sustain a concussion and lose consciousness. *Id.*, 10/22/24, at 88-96. Sean also testified at the WCP that, over the next three years, he sustained three additional concussions "due to collisions during football games [where h]e briefly lost consciousness [and] experienced dizziness, confusion[,] and sensitivity to light and sound." *Id.* at

---

[12] The Bertons were not permitted to have the written instructions with them on the stand when they testified at trial.

91.  Sean further testified during the WCP that he "experienced ongoing symptoms after August 20, 2004, including headaches, vision problems, memory problems[,] and cognitive problems." *Id.* at 94.

At the close of the Bertons' case, the NCAA moved for a compulsory nonsuit.  Following oral argument on the motion, the trial court granted the NCAA's motion.  *See* Pa.R.C.P. 230.1.  The court listed the following five grounds for its ruling:  (1) the claims are barred by the two-year statute of limitations; (2) the Bertons failed to set forth a *prima facie* case of liability under the "no[-]duty rule;" (3) the Bertons did not introduce sufficient evidence to prove causation which is necessary for negligence and fraud causes of action; (4) the Bertons failed to introduce sufficient "clear and convincing" evidence to maintain a cause of action for fraud; and (5) Joy Berton's loss of consortium claim fails as a derivative action of Sean's claims.  *See* Order, 10/23/24, at n.1.

On November 1, 2024, the Bertons filed a post-trial motion seeking a new trial on all issues of liability, compensatory damages, pain and suffering, and punitive damages.  *See* Plaintiffs' Post-Trial Motion, 11/1/24, at 1.  The motion raised claims of evidentiary errors including rulings on motions in *limine*, failure to compel testimony by NCAA officers, and failure to find that the NCAA had a legal duty to Plaintiffs.  *Id.* at 5-20.  In their memorandum in support of the post-trial motion, the Bertons also alleged that they did not know until 2021 that the "bell-ringing" hits Sean had sustained in college were, in fact, concussions "of any kind and that the NCAA knew they were Level 1

concussions" that required he be removed from play for the football season. *See* Post-Trial Motion, 11/1/24, at 11, 14. The trial court denied the post-trial motion on November 26, 2024.[13]

The Bertons filed a timely notice of appeal and court-ordered Rule 1925(b) statement. They present the following issues for our consideration:

> (1) Is the testimony of [the Bertons] regarding the first time they knew that the "bell-ringing" hits, "seeing stars" hits, and "dings" [Sean] sustained in NCAA football were mild concussions admissible to provide evidence (a) regarding

_____

[13] We note that "post-trial relief may not be granted unless the grounds therefor . . . are specified in the motion." Pa.R.C.P. 227.1(b)(2). Moreover, "[g]rounds not specified in the motion are deemed waived unless leave is granted upon cause shown to specify additional grounds." *Id.*

In their post-trial motion, the Bertons ask the trial court to "grant the instant motion, **remove the nonsuit**, and order a new trial on all issues of liability and damages." Plaintiffs' Motion for Post-Trial Relief, 11/1/24, at 21 (emphasis added). *See* Pa.R.C.P. 227.1(a)(3) (written post-trial motion must ask court to remove nonsuit). Upon review of the grounds specified in their motion, we note that the Bertons came dangerously close to waiving the statute of limitations issue. The only time the Bertons mention the concept of tolling the statute of limitations in their post-trial motion is in the following sentence—"The error was prejudicial because it precluded evidence important and relevant to Plaintiffs' burden of proof on the issue of the statute of limitations and equitable estoppel." *Id.* at 26.

Moreover, the Bertons' post-trial motion and supporting memorandum, Rule 1925(b) statement, and appellate brief do not state how the excluded testimony would have equitably tolled the statute of limitations and made their complaint timely filed. In fact, not until their reply brief on appeal do they tie the two arguments together. *See* Appellants' Reply Brief, at 33 ("The statute of limitations in this case was tolled until Sean Berton, through reasonable diligence, discovered his injury (latent brain disease) and its cause (bell-ringing hits in college football) in 2021."). However, in the interests of justice, we will liberally construe the Bertons' arguments raised in their post-trial motion and not find waiver.

when the statute of limitations time-period began to run under the discovery rule; and (b) regarding [] equitable estoppel?

(2)   Did the NCAA owe a duty of care to protect the health and safety of Sean [] as a college football player pursuant to Restatement (Second) of Torts § 323 and applicable case[]law?

(3)   Are the diagnostic terms CTE (Chronic Traumatic Encephalopathy), TES (Traumatic Encephalopathy Syndrome) and "neurodegenerative disease," and testimony by [the Bertons'] brain injury expert Dr. Brian Greenwald and diagnostic testimony by [the Bertons'] neuropsychological expert Dr. Carol Armstrong admissible to provide evidence of causation?

(4)   Is evidence of TES [] and the diagnosis of [Sean] admissible to provide evidence of causation pursuant to Restatement (Second) of Torts § 323?

(5)   Are admissions made by the NCAA via its executives and corporate designees after 2002 of a voluntary undertaking from inception to the present admissible to provide evidence of a duty by the NCAA to protect the health and safety of college athletes as that duty pertains to common law negligence and legal duty under the Restatement (Second) of Torts § 323?

(6)   Are admissions made by the NCAA via its executives and corporate designees after 2002 admissible to provide evidence of [the] NCAA's authority, power, and control to regulate the game of football and to take steps required to protect the health and safety of college football players?

(7)   Is the testimony of NCAA Vice President Terri Gronau admissible to provide evidence of a duty by the NCAA to protect the health and safety of college football players as that duty pertains to common law negligence, the Restatement (Second) of Torts § 323, fraudulent concealment, and constructive fraud?

(8)   Is the testimony of Sean['s] college football teammates regarding the absence of any concussion protocols and concussion education and the lack of recognition of concussions at all by athletic administrators, trainers,

coaches, and team physicians admissible to provide evidence of the NCAA's negligence, fraudulent concealment, and constructive fraud?

(9) Is the testimony of Sean [] regarding the NCAA's failure to make and follow rules regarding concussion education and management, as well as the failure of coaches and trainers to educate and treat players who sustained "bell-ringing" hits, "seeing stars" hits, and "dings" (then also known as Level 1 concussions) admissible to provide evidence of the NCAA's negligence, fraudulent concealment, and constructive fraud?

(10) Is the testimony of Sean [] regarding his knowledge of concussions and his diagnoses admissible to provide evidence of negligence, fraudulent concealment, and constructive fraud?

(11) Is evidence from economic expert Andrew Wood of the very tiny percentage of the NCAA's annual budget the NCAA expended on health and safety before and during the time Sean Berton played college football admissible to provide evidence of the NCAA's (a) admitted duty under Restatement (Second) § 323 and (b) [] enhancement of the risk to Sean Berton and other college football players, and (c) [] negligence, fraudulent concealment, and constructive fraud?

(12) Is evidence from Dr. Stephen Casper and Dr. Ellen Staurowsky that the NCAA had the power and authority during the period 1906 to 2002 to institute rules regarding concussion education and management, but failed to do so, admissible to provide evidence of the NCAA's (a) duty to protect the health and safety of college football players and (b) [] negligence, fraudulent concealment, and constructive fraud?

Appellants' Brief, at 4-8.[14]

A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause

_____

[14] We have renumbered the issues for ease of disposition.

of action[. I]n making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non[]suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury.

*Seels v. Tenet Health Sys. Hahnemann, LLC*, 167 A.3d 190, 205 (Pa. Super. 2017) (citation omitted). *See* Pa.R.C.P. 230.1(a)(2).

In their first issue, the Bertons claim that the trial court improperly precluded them from testifying "that May 2021 was the first time they knew that the 'bell-ringing' hits, 'seeing stars' hits, and 'dings' Sean [] sustained in NCAA football were concussions." Appellants' Brief, at 63. Specifically, the Bertons assert that it was not until they saw "internal NCAA documents" in May 2021, that they realized those hits were actually undiagnosed concussions.[15] *Id.* at 63-64. The Bertons argue they were prejudiced by the court limiting this testimony because they were not able to meet their burden of proof on the issue of the statute of limitations and their claims of fraudulent concealment and equitable estoppel. *Id.* at 64.

Sean asserts that although the trial court permitted him to testify regarding the hits he sustained while playing at WVU and NCSU and the lack of concussion education or protocols instituted by those Division I schools,[16]

_____

[15] Notably, the trial court *did* allow Sean to testify, over defense counsel's objection, that he "didn't know that all of the bell-ringing hits and dings that [he] suffered throughout [his] college career were considered Grade 1 concussion[s]." N.T. Jury Trial, 10/22/25, at 105.

[16] *See* N.T. Jury Trial, 10/22/24, at 32-43, 54.

- 13 -

the court precluded him from testifying about the "hundreds and possibly more than one thousand hits to the head . . . [that] were [n]ever identified as concussions by any coach, trainer, or team physician for" the Schools. *Id.* at 17. Sean argues that until he discovered that those additional hits were actually undiagnosed concussions, the statute of limitations was tolled on his action. *See supra* at n.9.

As detailed above, the parties agreed during trial that Sean would not testify regarding his "beliefs or opinions about [his] condition that [he had] formed based on discussions with any expert witness, physician, neuropsychologist, or lawyer." N.T. Jury Trial, 10/22/24, at 14-15; *see also supra* at 4-6. The parties also agreed that Sean would not testify regarding whether he thought his condition was permanent, could be treated or improved, or opine regarding the cause of his condition. *See* N.T. Jury Trial, 10/22/24, at 15. The trial court properly limited Sean's testimony on this subject in order to avoid confusing the jury and to prevent improper lay opinion testimony. *See* Trial Court Opinion, 4/29/25, at 60. *See also Young v. DOT*, 744 A.2d 1276, 1278 (Pa. 2000) ("[T]he employment of testimony of an expert rises from necessity, a necessity born of the fact that the subject matter of the inquiry is one involving special skill and training beyond the ken of the ordinary layman."); *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978) (reiterating well-established precedent that, in personal injury matters, it may be "possible for a jury reasonably to infer causation from the circumstances of an accident or occurrence, [but] it is generally acknowledged

that the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson") (citations omitted).

Because counsel agreed to limit the Bertons' trial testimony, the Bertons cannot now complain on appeal by characterizing the issue as one of trial court evidentiary error. *See Mazlo v. Kaufman*, 793 A.2d 968, 969 (Pa. Super. 2002) ("In order to preserve an issue for review, litigants must make timely and specific objections during trial."). Moreover, because the Bertons' appellate brief is devoid of any citation to case law discussing the discovery rule or tolling of the statute of limitations on a negligence action and application of that law to their claim, the argument is waived. *See Giant Food Stores, LLC v. THF Silver Spring Development, L.P.*, 959 A.2d 438, 444 (Pa. Super. 2008) ("Appellant's issue on appeal is waived because [Appellant] has failed to set forth in its appellate brief any citation to legal authority pertaining to [Appellant's] argument"). Finally, using a reply brief to argue, for the first time, the substantive issue of tolling of the statute of limitations is improper and requires our Court to suppress that portion of the brief. *See Commonwealth v. Fahy*, 737 A.2d 214 (Pa. 1999); Pa.R.A.P. 2101.

However, even if we do not find the Bertons' statute of limitations/tolling issue waived, it warrants no relief where the record shows that Sean was on "inquiry notice" that he had "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct,

- 15 -

without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause" prior to May 2021. *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 249 (Pa. 2021).

> Statutes of limitations are rules of law that set time limits for bringing legal claims. The time to file begins running from the time the cause of action accrued. 42 Pa.C.S.[A.] § 5502(a). Normally, a cause of action accrues when an injury is inflicted. Thus, the clock begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake[,] or misunderstanding do not toll the running of the statute of limitations.
>
>> However, where the complaining party is reasonably unaware that his or her injury has been caused by another party's conduct, the discovery rule suspends, or tolls, the running of the statute of limitations. To successfully invoke the discovery rule, a party must show the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause. A party fails to exercise reasonable diligence when it fails to make an inquiry when the information regarding the injury becomes available.

*DiDomizio v. Jefferson Pulmonary Assocs.*, 280 A.3d 1039, 1046 (Pa. Super. 2022) (citation, brackets, and quotation marks omitted).

Under the reasonable diligence standard, "a plaintiff's actions are examined to determine whether the plaintiff demonstrated those qualities of attention, knowledge, intelligence[,] and judgment which society requires of its members for the protection of their own interest and the interest of others." *Nicolaou v. Martin*, 195 A.3d 880, 893 (Pa. 2018). "It is the party that asserts application of the discovery rule that bears the burden of proving that reasonable diligence was exercised." *Id.*

A plaintiff's "failure to make inquiry when information is available is failure to exercise reasonable diligence [] as a matter of law." *Ingenito .v. AC & S, Inc.*, 633 A.3d 1172, 1174-75 (Pa. Super. 1993).  Moreover, as the Supreme Court explained in *Rice*, *supra*:

> [the inquiry-notice approach] t[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the inquiry, the fact of actual negligence, or precise cause.

*Id.* at 247.  *See also K.A.R. v. T.G.L.*, 107 A.3d 770, 779-780 (Pa. Super. 2014).  Under this approach, the statute of limitations commences regardless of whether a plaintiff has "notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Wilson v. El-Daeif*, 964 A.2d 354, 364 (Pa. 2009).  Moreover,

> [w]hen a court is presented with the assertion of the discovery rule[']s application, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause.  Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it.  Where, however, reasonable minds would not differ in finding that a party knew or should have known[,] on the exercise of reasonable diligence[,] of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.

*Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005).

In this Commonwealth, an action to recover damages for personal injury or fraud must be commenced within two years of injury.  *See* 42 Pa.C.S.A. §§ 5524(1), (7).  However, fraudulent concealment—a distinct legal theory from

fraud—"is based upon estoppel [and] has its basis in equity." ***Rice***, ***supra*** at 247. Thus, while the discovery rule tolls the statute of limitations,

> [f]raudulent concealment, in contrast, is rooted in the recognition that fraud can prevent a plaintiff from even knowing that he or she has been defrauded. Effectively, the distinction is that where fraud has prevented the plaintiff from knowing of his or her cause of action, that cause of action simply does not even exist until the plaintiff becomes aware of, i.e., "discovers," the fraud.

***Id.*** at 247-48. In ***Rice***, our court reaffirmed the principle that "the standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also should apply when tolling takes place under the doctrine of fraudulent concealment." ***Id.*** at 249, citing ***Fine***, ***supra*** at 861. ***See Rice***, 255 A.3d at 253 ("Under our jurisprudence, before a plaintiff may invoke the principles of fraudulent concealment, the plaintiff must use reasonable diligence to investigate her claims.").

Although the Bertons claim that Sean did, in fact, sustain head impacts and concussions while playing football at WVU and NCSU, at the time these impacts occurred, Sean believed that they were merely "nuisances [and] not an injury of any kind." Appellants' Brief, at 18.[17] Even though Sean testified

---

[17] Instantly, the only time that the Bertons argue that equitable estoppel tolled the statute of limitations on their claims until 2021 is in their reply brief. ***See*** Reply Brief, at 32-34. The following text is the extent of the Bertons' statute of limitations-tolling argument from their reply brief:

> The statute of limitations in this case was tolled until Sean [], through reasonable diligence, discovered his injury (latent brain disease) and its cause (bell-ringing hits in college football) in 2021. The NCAA concealed from [Sean] the information that bell-

*(Footnote Continued Next Page)*

that he was never diagnosed with a concussion while playing college football, *see* N.T. Jury Trial, 10/22/24, at 46, Sean credibly testified before a Workers' Compensation judge that he sustained hits while playing for the Vikings in 2004, which caused him to lose consciousness and sustain ongoing headaches, vision problems, and memory and cognitive issues. *Id.* at 94. *See* DX-76[18] at 1 (Sean Berton's 2015 Employee's Workers Compensation Claim Petition against Minnesota Vikings listing nature of his injury or disease as "**traumatic brain injury**") (emphasis added); *see also* Thomas M. Misukanis, Ph.D., Neuropsychological Evaluation, 8/31/15, at 5 (referral information noting Sean estimated he sustained 15-20 **concussions** overs his NFL career, that when he played for New York Giants in 2005-2006 "he was experiencing significant **post-concussive symptoms** including cognitive

_____

ringing hits were in fact mild concussions. Because of the NCAA's fraudulent concealment, [Sean] had no way of knowing that the bell-ringing hits he sustained in college football were[,] in fact[,] mild concussions that caused his neurodegenerative disease until 2021. The evidence precluded by the [t]rial [c]ourt that [the] Berton[s] did not discover until 2021 [Sean's] injury and its cause creates a factual issue of whether Sean [] was reasonably diligent in determining the cause of his injuries.

*Id.* at 33. It is well-established that "a reply brief cannot be a vehicle to argue issues raised but inadequately developed in appellant's original brief." *See Fahy*, 737 A.2d at 218 n.8. In fact, "[w]hen an appellant uses a reply brief to raise new issues or remedy deficient discussions in an initial brief, the appellate court may suppress the non-complying portions." *Id.*; *see* Pa.R.A.P. 2101.

[18] Although the Bertons' attorney objected to moving the first two pages of this exhibit into evidence, the court noted that because the entire exhibit, including the first two pages, was published to the jury, it is properly admitted into evidence and considered for purposes of the nonsuit.

dysfunction, headaches, depression, and suicidal ideation which have persisted," and that he "continues to struggle with various post-concussion symptoms sustained during his professional football career) (emphasis added); *id.* at 10 ("Mr. Berton's neurological history is significant for **numerous concussions/mild brain injuries**.") (emphasis added).

Therefore, despite the fact that the Bertons claim that they had no reason to know that Sean "had sustained undiagnosed concussions in [] NCAA Division I football" until he read a 1994 NCAA Sports Medicine Handbook in May 2021, *see* Post-Trial Motion, 12/9/24, at 12-14, all the law requires for inquiry notice is that the plaintiff have "actual or constructive knowledge of at least some form of significant harm and a factual cause linked to another's conduct, without the necessity of the full extent of the injury, the fact of actual negligence, or precise cause." *Rice*, *supra* at 249. *See Nicolaou*, 195 A.3d at 893 ("plaintiff's knowledge of 'injury' and 'cause' [for purposes of inquiry notice] does not require [] precise medical diagnosis") (citation omitted). Instantly, Sean's own testimony and other evidence admitted at trial confirm the fact that Sean was aware not only of his injuries, but also the cause of them, as early as 2005 and no later than 2011.

At trial, Sean testified that his physical symptoms began in 2005; however, medical reports from 2011 state that Sean "reports depressive-type symptoms that have persisted back to 1999." DX-49A, Magee Rehabilitation Initial Evaluation, 5/17/11, at 1. In May 2011, Sean was evaluated at Magee Rehabilitation's Philadelphia Concussion Center where he complained of

"depressive[-]type symptoms that have persisted back to 1999[,] . . . increased emotional lability, . . . rare episodes of temper and rage, [and] struggle[d, at the time] with impulsivity, poor attention and concentration, and short-term memory deficits." *Id*. *See also* DX-42, New York Giants Health History and Physical Examination, 1/5/05, at 2 (Sean indicating he sustained concussions in 2000 that resulted in loss of consciousness); DX-23, NCSU Athletic Training Post-Season Health Review Questionnaire, 5/4/01 (Sean acknowledging he "got into a fight [and] got hit in the head w[ith] a bat. Received a concussion [and] had to miss a game.").

On June 13, 2011, Sean visited Dr. Robert C. Cantu for an office consultation. Doctor Cantu's notes indicate that Sean was "being seen because of his current **post[-]concussion symptoms** of depression, dizz[iness], [being] in a fog, headache, irritability, difficulty with memory, balance[,] and concentration." DX-50A, Robert C. Cantu, M.D., 6/13/11, at 1 (emphasis added). At this consultation, Sean presented with the same symptoms complained of at his Magee Rehabilitation evaluation and told Dr. Cantu that he did not have any concussions in high school but recalled having two concussions in college and 10 or 11 concussions while playing in the NFL. *See* DX-50A, Robert C. Cantu, M.D., Evaluation, 6/13/11, at 1. Sean stated that he began playing football at the age of eight, has always been a linebacker or full back/tight end used "as a blocking back," and that he "learned to lead with his head." *Id.* at 1.

Sean reported to Dr. Cantu that one of the two concussions that occurred during college took place at WVU when he was breaking up a fight at a party and was "hit over the head with a pipe [that] rendered him unconscious." *Id.* Sean also told Dr. Cantu that his memory, concentration, and focus problems had forced him to go on medical leave from his job in June, that his "recent memory has progressively gotten worse," that he has depression and feels like he is in a fog on a daily basis, and that he "cr[ies] for no good reason." *Id.* at 2. Finally, Sean reported to Dr. Cantu that he had "made plans to have a neuropsychologist in Philadelphia" see him for an assessment at the recommendation of his primary care physician. *Id.*

We find that a reasonable person, facing the same circumstances confronting Sean in 2005, would have known upon the exercise of due diligence that his persistent headaches, dizziness, confusion, sensitivity to light, and vision and memory loss issues (i.e., injury) could have been factually linked not only to the concussions he sustained while playing in the NFL, but also to the "bell-ringing, seeing-star" dings and hits (i.e., cause) he received while playing five years of NCAA Division I football. *Wilson*, *supra*; *Fine*, *supra*. *See* N.T. Jury Trial, 10/22/24, at 32, 37 (Sean testifying he "had his bell rung . . . too many [times] to count" during his years playing collegiate football); *id.* at 31 (Sean testifying he violently collided with other players as a "wedge buster" on a regular basis "over and over again"); *see* N.T. Nonsuit Hearing, 10/23/24, at 32 (Bertons' attorney indicating the risk at issue in case is "long-term latent brain damage to players because of the

**repetitive nature of helmet-to-helmet hits**") (emphasis added). ***See***

***Haggart v. Cho***, 703 A.2d 522, 526 (Pa. Super. 1997) ("The statute [of

limitations] begins to run when the injured party 'possess sufficient critical

facts to put him on notice that a wrong has been committed and that he need[s

to] investigate to determine whether he is entitled to redress.'"). ***Cf.***

***Nicolaou***, ***supra*** at 895 (statute of limitations tolled where plaintiff had been

"repeatedly and definitively told by several health care professionals" that

suspicions of a specific disease were unfounded and were, in fact, a result of

"devastating effects of" another disease).

Instantly, the Bertons filed their complaint on September 3, 2021. At

the latest, Sean's cause of action accrued when he was reasonably aware that

an injury was inflicted[19]—as early as 2005 or no later than 2011. Thus, for

purposes of the applicable statute of limitations period, he needed to file his

complaint by October 2013, at the latest, when he was on "inquiry notice" that

he had "actual or constructive knowledge of at least some form of significant

harm and of a factual cause linked to another's conduct, without the necessity

of notice of the full extent of the in[jury], the fact of actual negligence, or

precise cause." ***Rice***, ***supra*** at 249. The fact that the Bertons may not have

known which party who may have been responsible for Sean's injury, i.e, the

_____

[19] Although Sean claims he did not discover his "latent" injury until October 2013 (date of NCAA Division I Manual) when he was diagnosed with progressive brain disease, even if we tolled the statute until that date, he would have had to have filed his complaint by October 2015 to be within the two-year statute of limitations.

NCAA, NFL, or another entity, or the long-term effects of his injury,[20] is of no moment for tolling purposes. **See Wilson**, (inability to identify defendants did not toll running of statute of limitation as to those parties). As plaintiffs, it was the Bertons' duty to use all reasonable diligence to ascertain the identity of the persons allegedly responsible for Sean's injuries. **See Cochran v. GAF Corp.**, 666 A.2d 245, 249 (Pa. 1995). Thus, the Bertons' action was commenced more than 6 years late and the trial court properly dismissed the action on the basis of the statute of limitations.

Moreover, because the real object of the Bertons' action was to recover damages for Sean's personal injuries, not for some other injury stemming purely from the purported fraud, the statute of limitations for negligence subsumes all of the other causes of actions. **See Fine**, at 861 ("a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause").[21]

Judgment affirmed.

_____

[20] **See** N.T. Nonsuit Hearing, 10/23/24, at 32 (Bertons' attorney indicating the risk at issue in case is "**long-term latent brain damage** to players because of the repetitive nature of helmet-to-helmet hits") (emphasis added).

[21] Given our conclusion that nonsuit was properly granted on the basis of the statute of limitations, we need not address the remainder of the Bertons' claims that involve evidentiary error with regard to the burden of proof on their causes of action.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>2/27/2026</u>